## DENVER CIRCLE R. CO. v. NESTOR.

1. The act of February 10, 1883, section 3, providing that in all civil cases, both at law and in equity, the superior courts shall, within the cities and towns for which they are created, have concurrent jurisdiction with the district court, and that the proceedings, practice and pleadings therein shall be the same as in the latter court, is not in violation of article 5, section 24, of the state constitution.

| 10 | 403 |
| 10 | 426 |
| 10 | 427 |
| 10 | 428 |
| 11 | 61 |
| 11 | 250 |
| 10 | 403 |
| 13 | 508 |
| 10 | 403 |
| 20 | 17 |
| 10 | 403 |
| 21 | 114 |
| 10 | 403 |
| 25 | 181 |
| 10 | 403 |
| 27 | 280 |
| 10 | 403 |
| 30 | 109 |
| 10 | 403 |
| 36 | 117 |

2. Under act of February 10, 1883, section 3, prescribing the jurisdiction and practice of the superior courts, it is proper for the clerk of said courts, upon the failure of the judge to appear on the first day of the term, to adjourn the court from day to day, in accordance with the practice of the district court.

3. Under the Revised Statutes, 1868, page 619, section 5, by the dedication to the city of Denver of the streets of an addition thereto, platted in accordance with the provisions of the statute in force in May, 1876, the said city acquired only a qualified fee therein, in trust for the public for the *ordinary* and *necessary* purposes to which the streets of a city are usually subjected.

4. The charter of April 7, 1874, of the city of Denver, giving to the city council power to control its streets, to regulate the construction and operation of street railways, and the running of locomotive engines and cars, and the location and construction of railroad tracks within the city, does not confer upon the council such authority to license the construction of railroad tracks lengthwise of its streets and thoroughfares generally, as to charge the purchasers of abutting property with notice that they may be so used by railroad companies for the running of their trains, in common with every other mode of conveyance.

5. Under the authority of the charter of April 7, 1874, of the city of Denver, defining the powers of the city council with regard to the railroads within the city, and Revised Statutes, 1868, page 619, section 5, limiting the city's title to the streets dedicated to it, to a qualified fee, the license given by the city council to a railroad company to construct a track and run its trains lengthwise of a street of an addition is an appropriation of such street to an extraordinary use, not within the contemplation of the act of dedication, nor authorized by any legislative sanction for general application throughout the city, and cannot afford immunity from liability for actual injuries thereby resulting to the property of abutting owners.

6. An action was brought by an owner of property abutting on one of the streets of a certain addition to the city of Denver, to recover damages for injuries done to his property by a railroad company in constructing a road and running its trains the length of the street in front of his premises. *Held,* that since the injuries to the property were done after the state constitution went into effect, its provisions in regard to compensation for the taking or damaging of private property for public or private use may properly be invoked in aid of recovery.

7. A failure to reply to matters set up as a defense to an action is an admission of the truth of the facts alleged, but *not* of the legal conclusions deduced therefrom.

HELM, J., concurring specially.

*Appeal from Superior Court of Denver.*

THE complaint alleges damages done to appellee's property, consisting of two lots with dwelling-house and other improvements thereon, abutting on a street called "Willow Lane," in Witter's first addition to the city of Denver, by the construction of appellant's railroad track, and the running thereon in said street of its trains of cars propelled by steam-engines. The injuries and annoyances complained of are the excavation and obstruction of the street in front of appellee's property, so as to prevent ingress and egress to and from the same, casting upon and invading the premises with dirty steam, live cinders, dust and smoke, disturbing appellee and his family day and night by the noise of the cars, and the whistles and bells of the engines, by reason whereof the safety of his property was put in danger, its convenient and comfortable enjoyment interrupted and impaired, and its value greatly diminished. A question of jurisdiction is raised here, it being claimed that the superior court was wholly without jurisdiction, under the law and the constitution, to entertain the cause. The main ground of defense relied upon aside from the question of jurisdiction is that said Witter's addition was dedicated to the city of Denver before the state constitution went into effect, and under the statutes then in force the title to the streets was thereby vested in the city in fee-simple; that the city charter, granted prior to the adoption of the constitution, empowered the city to authorize and license the construction of steam railroads in all the streets of the city, and that the city did license the defendant, by an ordinance duly enacted, to grade said street, and to lay down its track, and operate its railroad therein. It was also alleged in this connection that the established grade of the street was not altered; that appellant operated its road with care, and that the license of the city afforded it complete immunity from liability for damages

on account of the construction and operation of its road. These matters were set up in the third defense, and no reply was filed thereto. The appellant not appearing at the trial, the case was tried by the court without a jury, and the judgment rendered in favor of the appellee.

Messrs. J. P. BROCKWAY, E. L. JOHNSON and C. E. GAST, for appellant.

Messrs. BROWNE and PUTNAM, for appellee.

BECK, C. J.. The first and fifth assignments of error attack the jurisdiction and practice of the superior court. The first alleges that the court did not have jurisdiction of the subject-matter of the action; the fifth is to the effect that no term of said court existed at the time of the trial below, in October, 1884, the September term having lapsed for failure of the judge to appear on the first day of the term; that the practice provided by law for the district courts, in such cases, not being applicable to said superior courts, the clerk thereof was without any authority to adjourn the court from time to time, as he did, until the appearance of the judge. In the discussion of these assignments, appellant's counsel take the position that the superior court was never constitutionally clothed with any jurisdictional practice whatever. In support of this proposition it is argued that the act creating superior courts, and prescribing their powers, proceedings and practice, is in direct conflict with the provisions of section 24, article 5, of the state constitution, and therefore null and void. The legislative act in question is entitled "An act to provide for the creation and organization of superior courts in cities and incorporated towns; to prescribe the jurisdiction, powers, proceedings and practice of such courts, and to define the duties and qualification of the judges and other officers connected therewith." This act is composed of twenty sections, the jurisdiction and practice of said superior courts being defined in sec-

tion 3, which reads as follows: "Section 3. Such superior courts shall have original and concurrent jurisdiction within the limits of the several cities and incorporated towns for which they are created with the district courts of the state in all civil causes, both at law and in equity, and such appellate jurisdiction in such causes as is provided by law for the district courts, and shall be governed in all proceedings, with reference to practice and pleadings by the laws now or hereafter to be enacted for the district courts. All process issued out of the superior court shall be issued and served in like manner as similar process is issued and served from the district courts of the state." Additional appellate jurisdiction and power to regulate the practice and proceedings in other respects, not provided by law, is given in other sections. The provisions of the constitution with which the section quoted is supposed to conflict, being section 24, article 5, are: "No law shall be revived or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length." The first proposition is: the act violates that clause of the preceding section which prohibits the amending of laws without publishing at length the portion amended. A single reading of these provisions of the statute, and of the constitution, might seem, at first view, to sustain the proposition of counsel, but a careful examination of the subject, with a view to ascertain the object of the requirements, and a consideration of the consequences which would result from adopting the interpretation contended for, will show that the views of counsel cannot be sustained. Counsel is mistaken in saying that the act of the legislature in question is a direct attempt to amend all the laws relating to the district courts. It does not in terms assume to amend or change in any particular any law whatever. The declaration that the superior courts shall have original and concurrent

jurisdiction in civil cases with the district courts of the state, within their territorial limits, is a reference to the constitution for such jurisdiction. Article 6 of that instrument confers this jurisdiction on district courts, and it is to be found nowhere else. It would seem to be an irrational construction of a constitutional provision to require the legislature, whenever it becomes necessary, in the passage of laws, to refer to that instrument for powers or procedure to execute a law, to go through the idle and senseless form of re-enacting and publishing at length the constitutional provision referred to. The appellate jurisdiction of the district courts, and the provisions concerning the practice and pleadings of said courts, are to be found in the General Statutes. And while no direct attempt was made to amend these statutory provisions by the passage of the act in question, the legal effect is an amendment thereof by implication. Amendments of this character are not within the constitutional provision which requires so much of the act as is amended to be re-enacted and published at length. Cooley, Const. Lim. 181.

But our attention is directed to another provision of said section 24, viz.: "No law shall be * * * extended or conferred by reference to its title only, but so much thereof as is * * * extended or conferred shall be re-enacted and published at length." This is a provision not usually found in constitutions. Considered and construed in connection with the rest of the section in which it appears, and with reference to other portions of the constitution relating to the same subject-matter, it is a wholesome provision. It is well understood by the profession that certain constitutional provisions, and especially those of sections 24 and 25 of the legislative article, and section 28 of the judiciary article, were designed to remedy and prevent well-known abuses of legislation existing at the time of the framing of this instrument. These were the evils of special legislation, and the vicious practice of amending statutes by referring to the title,

and then declaring that certain words and phrases appearing in certain lines and sections be stricken out, and certain other words and phrases inserted therein. The clause of section 24, last quoted, goes further than the clause previously considered, and extends to cases of amendments by implication. They were not intended, however, to apply alike to all legislative enactments, including those wherein a reference to the general laws becomes necessary for the means of enforcing and carrying their provisions into effect. Such an unrestricted interpretation is not admissible, because it would be an unreasonable construction, and one that would impose upon the people more serious evils than those sought to be cured or avoided by the several sections and clauses of the constitution referred to. We recognize the force of the maxim that if the natural signification of the words employed involves no absurdity, the meaning apparent upon the face of the constitution is the only one intended to be conveyed, and that it is not lightly to be inferred that any portion is so ambiguous as to require extrinsic construction. We also indorse the salutary rule that the argument *ab inconvenienti* is not to be permitted to influence the courts to defeat by construction a constitutional mandate. It is not our purpose to defeat but to enforce the mandate in question, and to enforce it according to its reason and spirit, and the causes which led to its enactment. We agree with Judge Story that no construction of a constitutional provision is to be allowed which plainly defeats or impairs its avowed objects. "If there are," says that eminent jurist, "words which are fairly susceptible of two interpretations, according to their common sense, the one of which would defeat one or all of the objects for which it was obviously given, and the other which would promote all, the former interpretation ought to be rejected, and the latter held to be the true interpretation." Story, Const. § 428. All the authorities agree that where the words employed are

capable of a construction which involves a manifest absurdity, it should not be adopted, but the intent, if it be properly ascertainable, is to govern. To this end resort may be had to the prior state of the law for the purpose of ascertaining the mischief designed to be remedied or the object sought to be accomplished. With Judge Cooley we hold that a reasonable construction is what the constitution demands and should receive; that the real question is what the people mean, and not how meaningless their words can be made by arbitrary rules. Cooley, Const. Lim. 74.

That the construction contended for involves not only an absurdity, but the most serious evils, a little reflection will show. The manner and forms of proceeding for executing laws on general subjects of legislation are all provided in the General Statutes of the state. Ordinary subjects of legislation are dealt with at every session of the general assembly, and reference to the General Statutes is often necessary for the means by which they are to be carried into effect. To re-enact and publish at length these various forms and proceedings on the passage of such acts would serve no useful purpose whatever. Take, for example, an act imposing a tax upon a new subject of taxation; to require the legislature to ingraft on such an act the numerous details of proceeding and forms provided by the revenue laws for the valuation of property, the levy of assessments and collection of taxes, would be as useless as it would be senseless, expensive and oppressive. Considering the many subjects of legislation, concerning which the machinery for executing the law of the legislature is already provided, the consequences of enforcing the constitutional provisions under the construction here contended for would be far-reaching and serious. The bulky proportions which the laws would soon attain would be of itself an intolerable evil. In this connection the remarks of Judge Cooley on the subject of amendments by implication are in point. Sec-

tion 25, of article 4, of the Michigan constitution, provides that "no law shall be revised, altered or amended by reference to the title only, but the act revised, and the section or sections altered or amended, shall be re-enacted and published at length." Judge Cooley, in a learned opinion in *People v. Mahaney*, 13 Mich. 481, held that amendments by implication were not within the purview of the above section. Among other reasons assigned are the following: "If, whenever a new statute is passed, it is necessary that all prior statutes modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the state would be required to be republished at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was. If, because an act establishing a police government modifies the powers and duties of sheriffs, constables, water and sewer commissioners, coroners, mayors and justices, and imposes new duties upon the executives of the cities, it has thereby become necessary to re-enact and republish the various laws relating to them all as now modified, we shall find, before the act is complete, that it not only embraces a large portion of the general laws of the state, but that it has become obnoxious to the other provisions referred to, because embracing a large number of objects, only one of which can be covered by its title." The same difficulties exist in the present case, and the same consequences would follow the arbitrary construction which we are asked to make. In referring to the prior state of the law for light as to the intent of the constitutional provision we are not left to vague conjectures as to the objects intended to be accomplished and the mischief designed to be remedied. They are clearly ascertainable by an inspection of the acts themselves. One of the evils designed to be remedied was the vicious system then prevailing of *extending*, at different sessions of the legislature, the

operation of a special statute, enacted for a certain county
or town, to other counties or towns by reference to its
title merely, and in many cases publishing no law what-
ever. Thus, on February 9, 1874, the territorial legisla-
ture declared "that the provisions of an act entitled 'An
act concerning *certiorari* to justices and probate courts,'
approved February 2, 1872, being a special act applied to
Gilpin county alone, be extended and made applicable to
Boulder county." Laws 1874, p. 65. This is the entire
act as published, save the title. Another act illustrating
this sort of legislation reads as follows: "That the act
entitled 'An act to regulate ditches used for farming
purposes in the counties of Costilla and Conejos,' approved
February 5, 1866, be and the same is hereby extended to
and made applicable in the county of Huerfano." Laws
1872, p. 143. By the foregoing and similar legislation
no laws on the subject-matter of the titles employed were
either enacted or published. It was merely extending, by
reference to titles, laws enacted for certain localities to
other localities. In such cases these acts, *as published*,
were incomplete and unintelligible.

We will now give an example illustrating all the evils
designed to be cured, an example of the manner in which
statutes were sometimes *revived*, *amended* and *extended*,
by reference to the title only, without publishing the acts
in the form so left, showing the changes therein made.
We refer to the act of March 11, 1864 (Laws 1864, p. 139),
which prescribes rules and regulations for executing the
trust arising under the act of congress of May 23, A. D.
1844, and any amendments that were made thereto, "for
the relief of citizens of towns upon lands of the United
States, under certain circumstances." This was an act
consisting of twenty-two sections, and was applicable to
the whole territory. On February 10, 1865, another act
was passed purporting to be amendatory of the former
act. The first section is as follows: "That section 2 of
said act be amended by inserting the words, 'his or their

successors,' between the words 'congress' and 'shall,' in the third line from the top of said section." The remaining sections provide for the sale of unclaimed lots and blocks of land in the town of Boulder under the provisions of the original act as amended. The seventh section of the amendment is as follows: "That this act shall be construed to apply alone to the town of Boulder, in the county of Boulder, territory of Colorado." Laws 1865, p. 130. Another act, purporting to amend the original act, was passed February 9, 1866, the amendments all relating to lots in the city of Denver. Laws 1866, p. 87. By this time the legislature appear to have entertained doubts as to the existence of the original act. Accordingly, on February 11, 1870, an act was passed "to *revive* and *amend*" the original act, "so as to provide for the disposition of lands and lots in the town of Georgetown, under the act of congress entitled 'An act for the relief of the inhabitants of cities and towns upon the public lands.'" The first section declares that the "act approved March 11, 1864, be, and the same is hereby, revived, and declared to be in full force and effect: provided that said act shall be taken and held, in its different provisions, to intend an act of congress entitled 'An act for the relief of the inhabitants of cities and towns upon the public lands,' approved March 2, 1867;" which, it will be observed, was a different act of congress from that mentioned in the original act. Sections 8, 15, 18 and 21 are then declared to be stricken from the original act. Certain words are then stricken out, and certain others inserted in lines 1 and 2 of section 9, in lines 4 and 5 of section 14, in lines 7 to 18, and 23 to 28 of section 12, and certain words stricken out of the last line of section 11, and the twenty-ninth line of section 12. Finally, it is declared "that the act hereby revived shall have no other or further effect than to provide for the disposition of lands and lots in the town of Georgetown * * * under said act of congress, approved March 2, 1867." The foregoing ex-

amples will be sufficient to illustrate the evil system of legislation existing at the date of the constitution. Acts of the legislature were often incomplete in themselves, and in order to ascertain what the law was on a given subject, it was necessary to collect the amendments made thereto at successive legislative sessions, and out of the scattered fragments to construct an act which should express the final will of the legislature. It was this state of bewilderment and confusion into which the laws had been thrown by *special legislation*, by amendments made by reference to *lines and sections*, and by the *wholesale extension* of laws, that was designed to be corrected and guarded against by section 24 of the constitution.

The constitution of New York contains a provision which is the same in substance and effect. It is: "No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or any part thereof, shall be applicable, except by inserting it in such act." Sec. 17, art. 3. In construing this section the court of appeals said: "It is not necessary, in order to avoid conflict of this article of the constitution, to re-enact general laws whenever it is necessary to resort to them to carry into effect a special statute. Such cases are not within the letter or spirit of the constitution or the mischief intended to be remedied. By such a reference a general statute is not incorporated into or made a part of the special statute. The right is given, the duty declared, or burden imposed by the special statute, but the enforcement of the right or duty, and the final imposition of the burden are directed to be in the form and by the procedure of the other and general laws of the state. Reference is made to such laws, not to affect and qualify the substance of the legislation, and vary the terms of the act, but merely for the formal execution of the law." *People v. Banks*, 67 N. Y. 568.

We think it clear that the act organizing and prescrib-

ing the jurisdiction and procedure of the superior courts is not obnoxious to the constitutional objections made. We are also of opinion, for the same reasons, that the term of the court below did not lapse, as claimed, and that the court had jurisdiction to render the judgment appealed from.

The remaining errors assigned question the authority of the court to render judgment against appellant upon the law and the evidence. The main ground of defense is the license granted the appellant by the city ordinance of January 28, 1881, which, it is contended, afforded it, under the charter of February 13, 1874, the same rights and immunities in the streets as the proprietors of other modes of conveyance. In so far as the legal points raised and discussed involve a construction of the state constitution they are settled in the case of *City of Denver v. Bayer*, 7 Colo. 113. And so far as the attempt is here made to obtain a reconsideration of the construction there given to the constitution it must fail. That question was thoroughly investigated by the court, and the decision made after a careful consideration of all the authorities bearing thereon. We are satisfied with the construction adopted and adhere thereto.

The argument here is largely based on the proposition that the constitution does not control the questions arising in this case, for the reasons that it went into effect subsequent to the passage of the law under which the street in question was dedicated to public uses, subsequent to the act of dedication, and subsequent to the date of the city charter by virtue of which the ordinance was passed licensing the appellant's occupation of the street in question. The first questions which we will proceed to consider are what was the nature and extent of the title acquired by the city of Denver in and to the streets of additions thereto, which, prior to the constitution, were surveyed, laid out, platted and made part of the city under the provisions of the general statutes then in force,

and in conformity with its charter, and what rights and interests in said streets, if any, remained with the pro- prietors of the land or their grantees, the abutting lot owners? The constitution went into effect August 1, 1876. Daniel Witter's first addition to the city of Den- ver, in which the appellee's lots are situate, was legally surveyed, laid out, and the plat thereof recorded in the manner provided by statute, and became, by force of the statutes, part of the city, May 9, 1876. R. S. 1868, p. 616, § 12; R. S. 1868, pp. 618, 619, §§ 1–5; Charter 1861–1874, art. 1, § 3. It will be observed that the statute in such cases does not vest in the city an absolute fee in the streets. Section 5, page 619, Revised Statutes, is as follows: "Upon the filing of any such map or plat the fee of all streets, alleys, avenues, highways, parks, and other par- cels of ground reserved therein for the use of the public, shall vest in such city or town, if incorporated, in trust for the uses therein named and expressed; or if such town be not incorporated, then in the county until such town shall become incorporated, for the like uses." The effect of this provision is to vest in the city a qualified fee in the streets for the use of the public. The alleged power of the city to authorize the occupation of the public street called "Willow Lane" by an ordinary railroad, with trains of cars propelled by steam-engines, without liabil- ity for injuries to property occasioned by the construction and operation of the railroad, seems to be based on the proposition that the city, by virtue of the dedication men- tioned, was vested with title to the streets in fee abso- lute under the statutes then in force. This proposition is defeated by the express words of the statute just cited. The effect of the dedication proceedings was merely to vest in the city the title to the streets in trust for the general public for street purposes. As to all other pur- poses there remained in the proprietor of the addition reserved rights in the streets, which were capable of being transferred by deed to the purchasers of abutting

lots, as rights appurtenant thereto. These are property rights, and are held by the courts to constitute property. All public dedications, said the supreme court of the United States, must be considered with reference to the use for which they are made. *Cincinnati v. White's Lessee*, 6 Pet. 431.

A dedication for street purposes constitutes a contract between the proprietor of the land on the one hand, and the representative of the public on the other. Cooley, Const. Lim. (5th ed.) 331-335. In the present instance an absolute fee in the streets not having passed to the city, it becomes important to construe the contract of dedication in order to ascertain the respective rights and privileges of the parties thereto. The weight of authority is to the effect that when the fee of a street is in the municipality in trust for the public for street purposes, the paramount control thereof is in the legislature as the representative of the public, and the municipality may apply them to such uses as are authorized by statute. In the absence of legislation on the subject, the municipal government may appropriate the streets to the ordinary purposes of business and travel. The usual modes of travel and the usual means of conveyance may be employed by which the inhabitants are accustomed to pass or be conveyed through the streets of a city. Appropriation of the streets to such uses is authorized by the common law. The abutting lot owner is presumed to purchase with knowledge of this servitude, and for injuries to his property necessarily incidental to those uses he cannot complain. When the legislature vests in the municipal authorities a general control of the streets, judicial opinion is divided concerning the extent of such power. The better view would seem to limit the authority to the ordinary uses of the streets. This includes such modes and means of passage upon and over the streets as are usual in cities, and such additional uses as the health and convenience of the city, in view of the ex-

tent of its population, may require; as the construction of sewers, the laying down of gas and water pipes, the grading and paving of the streets, and the like. But this general supervisory power is not to be enlarged by construction, so as to authorize an extraordinary use of the streets, or their use by extraordinary or unusual means, without express or clearly implied legislative sanction. If the municipality, without statutory authority therefor, authorizes their use for or by extraordinary purposes or means, in such a case as the present it would be inconsistent with the contract of dedication, for the lot owner does not purchase with notice that the streets may be put to such uses. Cooley, Const. Lim. 676; 2 Dill. Mun. Corp. §§ 680-683; also §§ 713-717; Mills, Em. Dom. §§ 202-207; Pierce, R. R. 242-246. The decisions of the court of appeals of New York are recognized by law-writers and courts as weighty authority on these questions. The decision in *Story v. Railroad Co.* 90 N. Y. 122, and the re-affirmance of its doctrines (in February of the present year) by the case of *Lohr v. Railroad Co.* 10 N. E. Rep. 528, sustain the views above advanced.

The following general deductions may be made as to the *status* of cases similar to the one before us, considered, as counsel suggests it ought to be, under the territorial organization and statutes alone: *First*. That the city council might properly authorize the streets of an addition to the city to be used for all ordinary and necessary purposes to which city streets are usually subjected, and to such further *local* uses and means of conveyance as the legislature may have authorized for the streets and thoroughfares of the entire city. *Second*. That the proprietor of the addition and his grantees must be held to have anticipated all these uses; and that incidental injuries arising from a careful exercise of those rights are *damnum absque injuria*. But as to extraordinary uses, those not authorized by legislative sanction for general application throughout the city, including its additions,

no such immunity exists. A license from the city, in the latter class of cases, would be no defense to an action for damages to abutting property.

But it is asserted, and the assertion frequently repeated throughout the extended brief of counsel for appellant, that the legislature conferred on the city, by its charter of April 7, 1874, in force at the time of the dedication, full power to appropriate these streets to all modes of travel, including railroad cars propelled by ordinary steam-engines. Upon this assertion is based the proposition that abutting lot owners must be held to have purchased their lots with notice that the streets might be appropriated to such uses.

We do not think these views are sustained by the provisions of the city charter. That instrument empowered the city council, "by ordinances not repugnant to the constitution of the United States or the organic law of this territory, to open, alter, abolish, widen, extend, establish, grade, pave, or otherwise improve and keep in repair, streets, avenues, lanes, alleys, sidewalks, drains and sewers." Art. 6, sec. 3, cl. 6. It authorized the city "to regulate and run horse-railway cars, or cars propelled by dummy engines, laying down tracks for the same, transporting passengers thereon, and the form of rail to be used: provided, that no ordinance shall be passed conflicting with any rights vested in the Denver City Railway by their charter." Sec. 3, cl. 45. Clause 47 of the same section is as follows: "To regulate and prohibit the use of locomotive engines, require railroad cars to be propelled by other power than that of steam, to direct and control the location of railroad tracks, to require railroad companies to construct, at their own expense, such bridges, tunnels or other conveniences at public railroad crossings as the city council may deem necessary, and to regulate the speed of all railroad trains."

These are all the provisions of the charter bearing upon

the subject, aside from the provisions concerning con-
demnation proceedings.     It is clear that the power
alleged is not contained in either the sixth or the forty-
fifth clause of said section 3.    The forty-seventh clause
does not mention streets, although it may include them,
nor does it purport to regulate the use of any mode of
conveyance mentioned in the other clauses or ordinarily
employed for the purposes of local travel through the
city.     This latter clause relates to railroad companies,
and to the ordinary railroad tracks on which trains of
freight and passenger cars, propelled by ordinary steam-
engines, are hauled back and forth between distant *ter-
mini*.    This clause was not intended to authorize cars or
trains of cars drawn by steam-engines to occupy and use
the streets and thoroughfares generally, in common with
all other modes of conveyance.    The general scope of the
clause, as indicated by the language employed, is the
regulation of ordinary railroads, whose lines shall be ex-
tended into and through the city.    And while it was
within the contemplation of the legislature that they
might enter and pass through the city, the power to regu-
late, direct and control them in the particulars specified
was not confined to such as should be constructed longi-
tudinally through the streets, but included as well those
built wholly or in part through other ground, and only
crossing the streets, diagonally or otherwise.    There is
no evidence of any intention in this clause of the charter
to authorize the city council to license railroad corpora-
tions to lay their tracks, and operate their roads into and
through the city, so as to afford them immunity from
liability for the actual injuries thereby resulting to the
property of citizens.    There being, then, in the charter,
no authority to use the streets generally for these pur-
poses, nor any intention to grant immunity against in-
juries for the invasion of private property, the provisions
of the charter constitute no defense to this action.    If
the grant of power to license the corporations last men-

tioned be inferable from the forty-seventh clause it would necessarily be applicable to a few only of the numerous streets of the city. Being, therefore, a special power, it could not be held to have been within the contemplation of the act of dedication. The law is well settled that for the diversion of streets from the purposes regularly contemplated when they were dedicated, compensation must be made for injuries inflicted upon the property of abutting lot owners. The license to the defendant set up in the answer, therefore, constituted no bar to the action for damages.

Another point made and strongly urged is that the state constitution affords no remedy to the abutting lot owners in this case. The reasons assigned are — *First*, that the entire title to the street in question had passed to and vested in the city prior to the time the constitution went into effect; *second*, that the constitution does not, even by implication, divest the municipality of any powers over its streets previously conferred by its charter. It is not material to the right of action in the present case whether the constitutional provisions be applicable or not, since the right of action exists without reference thereto; yet, since the injury was done to appellee's property after the constitution went in effect, its provisions may be properly invoked. It may be conceded that the adoption of this instrument neither modified or curtailed the powers previously conferred on the city council over the streets; also that the legal rights and interests of the lot owners in the street remain as established by the act of dedication. The constitutional provision, "*that private property shall not be taken or damaged for public or private use without just compensation*," while not intended to disturb vested rights, nor in itself prohibitory of the exercise of powers previously granted by the legislature, is remedial in its nature and effect respecting existing property rights. Its mandate is that, where they are taken or injuriously affected subsequent to the day on which

the constitution went into effect, just compensation shall be made. That the appellee had a legal interest and vested rights in the street we have already decided. That his property was injuriously affected by the construction and operation of appellant's railroad in the street on which his lots abutted, after the constitution went into effect, sufficiently appears in the record before us. The phrase of our constitution, "or damaged for public or private use without just compensation," is an extention ·of the common constitutional provision designed for the protection of private property. It is a recognition of a new right of recovery, which is not limited to cases where an action would have lain at common law.

A point is made that no replication being filed to the third defense set up in the answer of the appellant, the same was admitted by appellee, and that on this ground the judgment should be for the appellant. This defense sets up the facts of dedication of Witter's first addition to the city, on May 9, 1876, and the license from the city to the appellant. In so far as the facts stated in this defense are concerned the failure to reply admits the same. It does not, however, admit the conclusions of law and the argumentative propositions therein contained. No exceptions were saved to the evidence, and it cannot be considered for any other purpose than to determine whether the court was authorized thereby, under the law, to find the issues for the plaintiff, and to render judgment in his favor. The evidence was ample for these purposes.

There being no reviewable error in the record, the judgment will be affirmed.

Elbert, J., concurs in the conclusion.

Helm, J.   I do not think the ownership of the fee of the street by a municipal corporation operates, in cases like this, to cut off the abutting lot owner's right to compensation under the constitution. But, be this as it may,

the chief justice has demonstrated in the principal opin-
ion that the fee to Willow Lane is, by the very terms of
the dedication and statute, conveyed to the city of Den-
ver in trust. If, therefore, under existing laws, there
can be such a thing as a wholly unqualified fee in the
city to a street, there is no room for contention that this
title is such a fee. And the argument based upon the
absolute ownership by the city of the fee to Willow Lane
requires no further notice.

We may concede that the statute under which Witter's
addition was recorded permits the granting of a right of
way by the city council for the construction of an ordi-
nary railroad through the street in question; and we
may concede, but without intending to pass upon its
correctness, counsel's conclusion that the power thus
given originally carried with it, when exercised, immu-
nity from damages for injury to the abutting owner;
still it would not follow that such immunity exists in
the case at bar. The ordinance granting defendant a
right of way through Willow Lane street was adopted
after the constitution took effect, and the injury of which
plaintiff complains was inflicted with that instrument in
force. If the statute theretofore existing avoided liabil-
ity for injuries like those here complained of, it was to
that extent inconsistent with the constitution, and to
that extent repealed by the constitution. Sec. 15, art. 2,
Const.; sec. 1, Schedule to Const.

Concerning the exact force of the expression, "or
damaged," as used in section 15, article 2, of the consti-
tution, I desire to add a few words. This expression, or
its equivalent, has received two different interpretations
from the courts: *First*, that it merely recognizes a right
of action *where one would have existed at common law*
but for condemnation statutes, or statutes enacted with
a similar design. This is the view taken by the English
courts, not without strong dissenting opinions, of a sim-
ilar statutory phrase, and of the same constitutional pro-

vision by at least one American case.  See *City v. Bayer*,
7 Colo. 113.  *Second*, that these words are the recogni-
tion of a *new right of action* not necessarily known to
the common law.  This seems to be the construction
given, though without discussion, by the supreme courts
of several states in the Union.  But as declared by us in
*City v. Bayer, supra*, it makes no difference which of
these views be adopted in cases like this; for a careful
examination of the decisions adhering to the former
shows that they would justify the recognition of a right
of action at common law under the facts of this case
were there no statute and ordinance permitting the use
of the street by the defendant corporation.   While, if the
latter view, to which I am strongly inclined, be accepted,
plaintiff's right to compensation is clear.

The principal reason for the position that the phrase in
question, and phrases of similar import, only give a right
of action where one would, in the absence of such stat-
utes as those above mentioned, have existed at common
law, is the consequences to which the opposite view might
lead.   It will be observed that the constitution inhibits
the damaging, without compensation, of private property
for either public or private use.   By giving these phrases
a literal and wholly unqualified construction, we not only
forbid the necessary and careful improvement of a street
by the city, without compensation for incidental injuries
to the abutting owner, but we also forbid the lot owner
himself improving his premises in a legal and careful
manner, without compensating an adjoining lot owner
for incidental injuries occasioned by such "prudent exer-
cise of his right of dominion."   This would be to an-
nounce the rule that one must so use his own as to inflict
absolutely no injury or inconvenience upon another, and
that, if he do not, he must expect to respond in damages
to that other; it would be practically to say that, in this
state, there can be no injuries to realty covered by the
doctrine of *damnum absque injuria.*

This court has uniformly declined to find in the constitutional language under consideration any such unqualified meaning. We know, and it is a proposition that will not permit of serious discussion, that such was not the intention of the people in adopting this language, or of the convention in using it. We think, and have so said, that it was the intention to permit a recovery for injuries inflicted upon an abutting owner through the occupation and use of a street by an ordinary railroad. And with equal confidence we have announced the view that it was *not* the intention to allow compensation to an abutting owner for injuries occasioned through a reasonable and careful improvement of the street by the city, for the benefit of the local public. *City v. Vernia*, 8 Colo. 399; *City v. Bayer, supra.* The framers of the constitution, and the people who voted for its adoption, understood that, with this instrument in force, certain injuries suffered by the proprietor of land through the legitimate and careful improvement of adjoining ground would continue to be wrongs for which the law provides no remedy. So, also, did the convention and the people understand that the abutting lot owner would anticipate, in making his purchase, that the street would necessarily be occupied by the local public for all the *usual and ordinary* uses of a highway; that the city would, from time to time, under the statutory powers conferred, so change and improve the street as to render it more convenient and useful for such purposes; and that incidental injuries indirectly resulting to him from such improvements would still be, as they were before the constitution, wrongs without a legal remedy. But it cannot be reasonably asserted that, in framing and adopting this constitutional provision, it was understood that the abutting owner would anticipate such an *unusual and extraordinary* use of the street as the one under consideration in this case; or that he would make allowance for such use in his purchase of the lot, or dedication of the street, as

the case might be. A distinction was, in my judgment, intended between those uses to which *every* street is primarily and necessarily dedicated, and those extraordinary uses which are tolerated in but very few, probably not more than one in a hundred, of the many streets required for its convenience by the local public.

I indorse the views of the chief justice concerning the jurisdiction of the superior court in the premises, and regularity of the proceedings before it. Upon the foregoing grounds, I also approve of the conclusion reached by him on the other branch of the case.

*Affirmed.*