## STATE ROADS COMMISSION OF MARY-LAND *v.* JONES, ET UX.

[No. 6, September Term, 1965.]

*Decided February 3, 1966.*

The cause was argued on 11/11/65 before Prescott, C. J., and Hammond, Horney, Oppenheimer and McWilliams, JJ.; and reargued on 12/6/65 before Prescott, C. J., and Hammond, Horney, Marbury, Oppenheimer, Barnes and Mc-Williams, JJ.

*J. Thomas Nissel, Special Attorney,* (on both arguments), with whom were *Thomas B. Finan, Attorney General, Joseph D. Buscher, Special Assistant Attorney General,* and *Herbert L. Cohen, Special Attorney,* on the brief, for appellant.

*Edwin T. Steffy, Jr.,* (on both arguments) for appellees.

McWilliams, J., delivered the opinion of the Court.

On 25 February 1953 Dr. and Mrs. H. Alvan Jones (appellees) acquired a tract of land in Howard County containing 26.3 acres, 25 of which lie in the northeast quadrant of the intersection [1] formed by U. S. Route 29 (Columbia Pike) which runs north and south and Md. Route 144 (Old Frederick Road) which runs east and west. The frontage on the north side of Route 144 is about 900 feet and on the east side of Route 29 about 600 feet. The balance (1.3 acres), triangular in shape, lies in the northwest quadrant, fronting about 500 feet on the west side of Route 29. The larger tract enjoys access to both Route 29 and Route 144 by private driveways, both of which had been in use before the appellees bought the property.

Some time prior to December 1963 the State Roads Commission (Commission), by formal resolution designated Route 29, from U. S. Route 40 to the Montgomery County line (about 14 miles), a *controlled access arterial highway.* On 27 December 1963 the Commission filed the usual condemnation petition against appellees for the purpose of acquiring the 1.3 acre parcel

---

1. Route 29 is bridged over Route 144 so that the two roads actually do not intersect.

on the west side of Route 29 and "all the right whatsoever of ingress and egress between the through highway [Route 29] and the remaining property of the * * * [appellees] * * * to the end that there will never be any vehicular, pedestrian and/or animal access to or from the through highway" and appellees' remaining property. Simultaneously with the filing of the petition the Commission, complying with the provision of Code Art. 89 B, § 9 and Maryland Rule U, deposited with the clerk the sum of $4001. Responding to interrogatories several months later, the Commission declared that $4000 was for the 1.3 acre parcel and $1.00 was for the closing of the driveway and the denial of all access along Route 29.

While negotiations between the parties failed to produce an agreement in respect of the value of the 1.3 acre parcel, the Commission *refused to discuss* the question of compensation for the closing of the driveway and the denial of access, taking the position that there was no damage and, in any event, the damage to the appellees, if any, was not compensable.

Appellees responded by moving the court to enter a summary judgment in their favor "as to that part of the plaintiff's suit relating to condemnation of their right of access to the east side of Route 29, so that the case * * * [might] proceed to trial only as to defendants' property on the west side of Route 29." On 12 January 1965 Judge Evans granted the motion for summary judgment, from which judgment the Commission has appealed.

The Commission contended, both in its brief and in its oral argument, that the closing of the driveway and the denial of access constitute a proper exercise of the police power and "therefore * * * [are] not * * * compensable item[s] of damage." It was unable, however, to reconcile this contention with the fact that the suit was brought pursuant to its powers of eminent domain and that it actually had paid damages into court. The amount, it is true, was nominal but it was the sum of money deemed by the Commission "to be the fair value of the land and improvements taken and damages done to the aforesaid property." Several members of the Court commented, during argument, on the inconsistency of the Commission's position and in the ensuing colloquy there were indications that

the propriety of the use of the police power in this and similar situations could not be resolved in this litigation. Recognizing the probability of an adverse holding, counsel for the Commission agreed to a suggestion by the Court that the case be reargued on the basis of an appropriate stipulation. The stipulation, to which counsel for appellees also agreed, is as follows:

"1. That the petition for condemnation for the denial of access and the $1.00 deposited therefor, shall be considered withdrawn from this case, prior to the hearing by the court below.

"2. That this Honorable Court decide the issue of this case as if the same were filed as a Petition for a Declaratory Judgement, i. e. whether access under the facts of this case, can be denied under the Police Power, or must be acquired by condemnation under the principles of eminent domain."

The Commission says that to make conventional highways safer for the transportation of the public it is necessary to use the police power to limit or deny access to the abutting landowner and that this is a proper exercise of the police power. It goes a long step further and contends that it is "obvious" that such a use of the police power "is an inherent segment of the highway laws." The Commission concedes that heretofore it has accomplished denial of access along existing highways only by paying compensation to the abutting landowner, the amount thereof having been resolved either by agreement or by condemnation. It further concedes that this case reflects a proposed change in policy, which, if successful, will result in substantial economies in the area of right of way acquisition.

It should be observed, as a prelude to the determination of the validity of the Commission's claim, that the police power inheres exclusively in the Legislature, and can be exercised by its creatures, such as the Commission, only to the extent it has been delegated. *Md. Coal Etc. Co. v. Bureau of Mines*, 193 Md. 627, 640, 69 A. 2d 471 (1949) ; 16 C.J.S., *Constitutional Law*, §§ 177-78 (1956) ; Oppenheimer, *Administrative Law in Maryland*, 2 Md. L. Rev. 185, 189 (1938). We shall concern ourselves, therefore, with the single question whether there has been

such a delegation. Any one undertaking this task would do well, by way of proper orientation, to keep in mind an observation made by Mr. Justice Holmes, in *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, 415-16 (1922):

"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. *Hairston v. Danville & Western Ry. Co.,* 208 U. S. 598, 605. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears."

\* \* \*

"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

There is, of course, a veritable gallimaufry of judicial opinion in respect of the right of access of abutting owners to highways. As long ago as 1907 the Supreme Court felt compelled to say:

"The right of an owner of land abutting on public highways has been a fruitful source of litigation in the courts of all the States, and the decisions have been conflicting, and often in the same State irreconcilable in principle. The courts have modified or overruled their own decisions, and each State has in the end fixed and limited, by legislation or judicial decision, the rights of abutting owners in accordance with its own view of the law and public policy." *Sauer v. New York,* 206 U. S. 536, 548, 51 L. Ed. 1176, 1182, 27 Sup. Ct. 686, 689 (1907).

We content ourselves by observing that the situation has not improved and we draw not a little comfort from the fact that

it will not be necessary, in this case, to undertake either a discussion or a reconciliation of these seemingly myriad decisions, to say nothing of the output of the text writers and the legal periodicals.

In the April 1940 issue of the Maryland Law Review there appeared a scholarly and exhaustive article by Robert R. Bowie, entitled *Limiting Highway Access,* 4 Md. L. Rev. 219. Professor Bowie reviewed all of the extant decisions of this Court, and as well the decisions of many other courts, devoting special attention to *Baltimore v. Dobler,* 140 Md. 634, 118 Atl. 168 (1922), (on a later appeal) 151 Md. 154, 134 Atl. 201 (1926), and *Krebs v. State Roads Comm.,* 160 Md. 584, 154 Atl. 131 (1931), on both of which the Commission places great reliance here. One of the conclusions reached by Professor Bowie was that "so long as some reasonable means of access is preserved, the public may restrict or *destroy* the access of an abutting owner to a particular road by any measures designed to maintain, improve or preserve the highway or to protect its users, *without paying him compensation or damages."* 4 Md. L. Rev. 219, 243. (Emphasis supplied.) Professor Bowie went on to say:

> "In conclusion it may be well to emphasize that this article has dealt only with the constitutional *power* of the state to limit the abutting owner's access in the public interest without compensation for resulting damage. *How far and in what cases that power should be exercised is of course a matter of legislative policy beyond the scope of this article." Id* at 246 (Second emphasis supplied.)

Whether it was merely *post hoc* or genuinely *propter hoc* we are unable to say; however, it is a fact that within less than a year after the publication of Professor Bowie's article the Legislature enacted Chapter 487 of the Acts of 1941, the provisions of which we have scrutinized and which we think are dispositive of the question now before us.

Chapter 487, *supra,* added to Article 89 B of the Code sections 214 to 219 (both inclusive) under the heading "Freeways." Sections 214 and 215 are as follows:

"§ 214. Establishment and construction.

"(a) *Authority.*—The Commission may lay out, establish and construct any State highway as a freeway. A resolution adopted by the Commission stating that a proposed highway is to be constructed as a freeway shall be conclusive evidence that the highway, when constructed, is a freeway with all the characteristics and incidents prescribed by this subtitle.

"(b) *No right of abutting owner to ingress and egress.*—When a highway is constructed as a freeway, no owner of land abutting the highway or other person shall have any right of ingress or egress, to, from or across such abutting land to or from the freeway. The Commission in its discretion, at the time of the construction of the freeway or thereafter, may designate points at which access will be permitted, upon such terms and conditions as it may specify from time to time. (An. Code, 1951, § 165; 1941, ch. 487, § 150.)

"§ 215. Designation of existing highways.

"(a) *Designation by resolution.*—The Commission may by resolution designate as a freeway all or any portion of any State highway theretofore laid out, adopted, established and constructed.

"(b) *Ingress and egress.*—When any existing State highway is designated as a freeway, then

"(1) The Commission may by *agreement or condemnation,* restrict or limit the right of any owner of land abutting the freeway to lay out or construct any *new* means of ingress or egress to, from or across such abutting land to or from the freeway, or to enlarge or extend any existing means of ingress or egress, and the Commission may, from time to time, designate points at which access will be permitted, or permit changes in existing means of access, upon such terms and conditions as it may specify; and

"(2) The Commission may *close* any *existing* means of ingress or egress to, from or across abutting land to or from the freeway by *agreement or condemnation.*

(An. Code, 1951, § 166; 1941, ch. 487, § 151.)" (Emphasis supplied.)

As has been said, the Commission has designated this part of Route 29 as a "controlled access arterial highway" which is defined in Code Art. 89 B, § 29, the text of which, in part, is:

"§ 29. Definitions.

"As used in this subtitle the following words and terms shall have the following meanings, unless the context shall indicate another or different meaning or intent.

"(a) *Arterial highway.*—The term 'arterial highway' shall mean a thoroughfare of one or more traffic lanes in each direction with or without physical separation of opposing traffic lanes, and which by the application of proper design standards such as adequate lane widths, adequate shoulders, proper sight distances and other such features of design can safely and expeditiously serve traffic volumes up to 3,000 vehicles per day, and shall embrace all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches and other structures which the Commission may deem necessary to the operation of the arterial highway, together with all property, rights, easements, franchises and interests acquired by the Commission for the construction and operation thereof.

"(b) *Controlled access arterial highways.*—The term 'controlled access arterial highway' shall mean a major thoroughfare of two or more traffic lanes in each direction having the same characteristics as an expressway except that the conflict of cross streams of traffic need not be eliminated at every intersection by means of grade separation structures.

"(c) *Expressway.* — The term 'expressway' shall mean a major thoroughfare of two or more traffic lanes in each direction, designed to eliminate principal traffic hazards, and shall embrace all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, and other structures which the Commis-

sion may deem necessary to the operation of the expressway, together with all property, rights, easements, franchises and interests acquired by the Commission for the construction and operation thereof, and having the following characteristics:

"(1) A median divider separating opposing traffic lanes to eliminate head-on collisions and sideswiping; (2) grade separation structures to eliminate the conflict of cross streams of traffic at all intersections; (3) points of access and egress limited to predetermined locations; (4) vertical curves of lengths sufficient to provide long sight distances; and (5) shoulders of widths adequate to permit vehicles to stop or park off traffic lanes."

Although these definitions seem to have been included mainly to provide a measure of clarity and exactitude to the 24 sections under the subtitle "Distribution and Use of Special Funds," we think they also have sufficient relevance to the question before us to be helpful in reaching our decision.

A comparison of section 29 (b) with sections 214-219 makes it clear that there is no significant difference between a "controlled access arterial highway" and a "freeway." The only difference between the "controlled access arterial highway" and the "expressway," as defined in sec. 29 (c) is that "cross streams of traffic need not be eliminated at every intersection by means of grade separation structures." Sections 213, defining "parkways," and 214-219 defining "freeways" are silent on the elimination of cross streams by grade separation structures. It must be assumed, therefore, that the Commission, in respect of "parkways" and "freeways," may, or may not, in its discretion, construct grade separation structures, just as it may, or may not, do so in the case of a "controlled access arterial highway." The Commission may "regulate, restrict or prohibit the use of such freeway (§ 217 (b)) [or parkway (§ 213 (d) (2))] by various classes of vehicles or traffic, * * *" and while it may not do this on "controlled access arterial highways" it certainly would be a simple matter to change the designation of any such road from "controlled access arterial highway" to "freeway" in the event it becomes necessary or desirable to regulate, restrict or

prohibit certain classes of vehicles or traffic from using the highway.

The "freeway" sections make no mention of "median dividers" as do section 29 (b) and (c) but this does not mean the Commission may not install them; indeed, it is hard to imagine a "freeway" which is not, or is not destined to be, a two lane divided highway. The requirement of limited points of access and egress appears to be common to "controlled access arterial highways," "expressways," "parkways" and "freeways." The same is true of "long sight distances" and "wide shoulders."

Whatever nuances may be involved in the use of these terms in the internal workings of the Commission, we think that, as far as the acquisition of rights of way are concerned, and particularly in the circumstances here prevailing, the term "controlled access arterial highway" has the same meaning as the term "freeway." Moreover, the Legislature appears to have been like-minded when, in 1951, it enacted section 44, reading as follows:

"§ 44. Ingress and egress—Width and locations.

"In order to promote and further highway safety, the State Roads Commission is hereby authorized to limit the width of points of existing ingress and egress and determine the locations of same that any commercial or industrial property owner or user may use into any existing State highway or section of State highway that carries an average traffic volume of more than 2,000 vehicles per day, such traffic volume to have been determined over a period of one year by procedures heretofore used by the State Roads Commission to establish densities of traffic. The Commission, if determined expedient for traffic safety, may so limit such width and location by any method it deems desirable, *provided, however, that nothing herein contained shall be construed to give the Commission the authority to deny any abutting property owner all access along any State highway except along freeways as defined in § 214 of this article.* (An. Code, 1951, § 32; 1951, ch. 611, § 21A.)" (Emphasis supplied.)

Nor will any inconsistency be found in the language of sec. 7 of Art. 89 B, wherein the powers of the Commission are set forth, and which provides, in part, that it may "acquire for the State of Maryland, *by agreement, gift, grant, purchase or condemnation proceedings* * * * *private property* * * * *including* * * * *rights or interests, franchises, privileges or easements* * * *." (Emphasis supplied.)

The Commission itself, until the change of policy earlier noted, has not (since 1941) attempted the closing of driveways or the denial of access by the exercise of the police power. In *Dudley, Jr. v. State Roads Comm.,* 224 Md. 613, 168 A. 2d 882 (1961) (decided on other grounds) it was noted that the deed to the Commission read, in part, as follows:

> " 'AND THE GRANTORS DO FURTHER GRANT' unto the State of Maryland to the use of the State Roads Commission, its successors and assigns, *any and all right whatsoever of the Grantors,* their heirs, successors and assigns, *of any means whatsoever of ingress and egress between the* THROUGH HIGHWAY and the remaining property across the line which is designated 'RIGHT OF WAY LINE OF THROUGH HIGHWAY' *to the end that there never will be any vehicular, pedestrian and/or animal access to or from said through highway and their remaining property* across those lines which are so marked on the above mentioned plats except by means of such public road connections to EXPRESSWAYS and/or private road connections to controlled access arterial highways as the 'COMMISSION', may construct, or permit to be constructed." (Emphasis supplied.)

Consistent, long continued, unvarying administrative practice will not be disregarded, even at the instance of the administrative agency itself, except for the strongest and most urgent reasons. *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603, 95 A. 2d 306 (1953); *Bosley v. Dorsey,* 191 Md. 229, 60 A. 2d 691 (1948); *Travers v. Fogarty,* 187 Md. 348, 50 A. 2d 238 (1946); *Wells v. Price,* 183 Md. 443, 37 A. 2d 888 (1944).

As has been noted the Commission relies heavily on *Dobler, supra,* and *Krebs, supra.* We think it is unnecessary to discuss either of those cases since they were decided before the Act of 1941. Also cited are *Langley v. Roads Comm.,* 213 Md. 230, 131 A. 2d 690 (1957) and *Turner v. State Roads Comm.,* 213 Md. 428, 132 A. 2d 455 (1957). Both *Langley* and *Turner,* however, were median-strip cases in which neither the closing of a driveway nor the denial of access were involved. In *D'Arago v. State Roads Comm.,* 228 Md. 490, 494-95, 180 A. 2d 488 (1962), also cited by the Commission, we held that where the highway in question is newly constructed, compensation will not be allowed unless the new road replaces or supersedes a previously existing road. Chief Judge Brune, for the Court, at 494, said:

"Turning to the appellant's first contention, it is clear that there never was any public road or right of way where the new Route 4 is now located. Hence, it is obvious that the appellant was not deprived of any easement of access to a highway which had been previously been appurtenant to her land. We find her claim for damages based upon denial of access to a new, limited-access highway, which did not replace or supersede any previously existing road, to be untenable.

"Although the origin of the right of access to public streets inhering in abutting property owners is said to be obscure (see *Bacich v. Board of Control,* 23 Cal. 2d 343, 350, 144 P. 2d 818), *it is a well established right in the nature of an easement appurtenant to the abutting land on an existing highway, and a condemnee is entitled to compensation for the taking thereof."* (Citing cases.) (Emphasis supplied.)

The Commission emphasizes the fact that it relies principally on *People v. Ayon,* 54 Cal. 2d 217, 352 P. 2d 519 (1960) and *Nick v. State Highway Commission,* 13 Wis. 2d 511, 109 N. W. 2d 71 (1961). Denial of access was not involved in *Ayon.* Two-way traffic in front of the property was canalized by a median strip creating a situation almost precisely similar to

*Langley, supra,* and *Turner, supra.* After holding that appellants had a right of direct access which could not be impaired without compensation, the court went on to say:

> "Under these well-settled rules the appellants are not entitled to compensation because of the divider strip placed in the middle of Azusa. They have direct access to that street and to traffic traveling in one direction on that street. * * * Nor can appellants complain because the relocation plan will divert some southbound traffic from Azusa in front of appellants' property. A property owner has no right to compensation because traffic is rerouted or diverted to another thoroughfare even though the value of his property is substantially diminished as a result." 352 P. 2d at 523.

Because the Maryland and Wisconsin constitutions are similar, in that compensation is directed for *taking* private property but not for *damaging* private property, the Commission argues that *Nick, supra,* is entitled to great weight. If the *statutes* were the same, certainly, in assaying *Nick,* we should be obliged to give it greater weight, but, the statutes are not the same. Nowhere in the Wisconsin statute, 1 Wis. Stat., § 84.25 (1963), will there be found anything remotely resembling sections 44, 214 and 215 of Art. 89 B, *supra.* So, when the Wisconsin Supreme Court, after approving this use of the police power, said:

> "No doubt the control of his access to highway 30 impaired the value of his land * * * but at the time of the Commission's declaration Reinders still had access in every part of his land to highway 30 via use of Calhoun Road. His access to the highway is made more circuitous but no part of Reinder's land was taken. The diminution in its value due to the exercise by the state of its police power in making highway 30 a controlled-access highway is not recoverable." 109 N. W. 2d at 73.

it was using language which we are precluded from using because we are otherwise enjoined by our Legislature.

A number of courts share the views we have expressed here-

in. The Florida court, where constitutional provisions much like our own prevail, in a recent case, had this to say:

"The rights of abutting owners may be subordinated to the public, and to that end regulated * * *. But the situation in the present case is much more extreme. The right of access is not being regulated but is being destroyed. The petitioners are being relegated to entrance and exit via secondary roads running at right angles to the highway in question which their property fronts. This, we think, cannot be summarily done, and we think the legislature had no intention that it could be accomplished without compensation to the owners for loss that might be suffered by them.

"In Chapter 338 we find that although the first section, 338.01, confers on the 'highway authorities of the state [the extensive power] to plan, designate, establish, regulate, vacate, alter, improve, maintain, and provide limited access facilities' latter parts of the chapter impose conditions for the protection of property owners. In Sec. 338.04 it is specified that for the purposes of the law the authorities 'may acquire private or public property and *property rights for limited access facilities * * * including rights of access * * *.'* (Italics supplied.) And immediately following in a second paragraph of the section, is this significant language: 'All property rights acquired under the provisions of this law shall be in fee simple.'

"In the situation described we are convinced the respondents should be enjoined from continuing with the conversion of the highway into a limited access facility or interfering with petitioners' right of ingress and egress until by eminent domain they have obtained the property and the property rights in fee simple as the legislature directed. In the course of the proceedings the petitioners will have the opportunity to present evidence of the value to them of the 'property and property rights' including the right of 'access,' which will be acquired for 'limited access facilities.' Sec.

338.04(1), supra." *Florida State Turnpike Authority v. Anhoco Corp.,* 116 So. 2d 8, 14 (Fla. 1959).

Language generally in accord with that used by the Florida court will be found in *Arkansas State Highway Comm. v. Arkansas P. & L. Co.,* 231 Ark. 307, 330 S. W. 2d 77 (1959); *Department of Public Works and Buildings v. Wolf,* 414 Ill. 386, 111 N. E. 2d 322 (1953); *State v. Marion Circuit Court,* 238 Ind. 637, 153 N. E. 2d 327 (1958); *Nichols v. Commonwealth,* 331 Mass. 581, 121 N. E. 2d 56 (1954); *Rothwell v. Linzell,* 163 Ohio St. 517, 127 N. E. 2d 524 (1955); *Ashworth v. State Road Comm.,* 147 W. Va. 430, 128 S. E. 2d 471 (1962).

While we think Judge Evans was entirely correct in granting the motion for summary judgment, further proceedings are necessary to bring the case to a conclusion. Since nothing will be gained by requiring the Commission to file a new condemnation petition, the trial court should strike out the summary judgment and allow the parties sufficient time to create, by appropriate pleadings, issues conformable to the decision reached herein. The costs will be paid by the appellant.

*Case remanded under Maryland Rule 871 a without affirmance or reversal for further proceedings not inconsistent with this opinion. Costs to be paid by appellant.*