## MACKIE ET AL. *v.* MAYOR AND COMMISSIONERS OF THE TOWN OF ELKTON

[No. 306, September Term, 1971.]

*Decided May 10, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, ▌ SINGLEY, SMITH and DIGGES, JJ.

*Frank Thomas Howard,* with whom was *Wm. Wilson Bratton* on the brief, for appellants.

*O. Robert Lidums,* with whom was *Edward D. E. Rollins, Jr.,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

HAMMOND, C. J., and SMITH, J., dissent and HAMMOND, C. J., filed a dissenting opinion in which SMITH, J., concurred at page 423 *infra.*

The appellant (Mackie) owns and farms a number of acres in the northeast corner of Cecil County about a mile from the Mason and Dixon line. This "rolling and scenic" countryside is drained by Little Elk Creek and a number of its small but picturesque tributaries. For this very reason the town of Elkton, the county government, and the United States Department of Agriculture have in mind building, on Mackie's land, a dam to impound the waters of Little Elk Creek. That Mackie takes a very dim view of this is a gross understatement.

This dispute arises out of the appellees' demand that Mackie allow their agents to enter upon his property to make "certain preliminary geological investigation[s]." They informed Mackie that they had a legal right to make such investigations and that they would go to court if he refused. He did and they did. Suit to compel Mackie to permit entrance upon his land was filed on 11 August 1971.

The parties have agreed that the proposed geologic investigations entail core drilling to ascertain the condition of the strata of underlying rock and the digging of large, deep pits with a backhoe to assay the quality and availability of fill material for the earthen embankments of the proposed reservoir. The core drilling operation is described as follows:

> "Core drilling investigations entail boring test holes (4-8 inches in diameter) into the underlying rock strata at depths of 50 feet to may-

be even 150 feet. This core drilling is done with machines similar to well drilling machines. Normally a 'skid rig' or mounted rubber tire core drilling machine is used. Water is normally pumped from a stream to the core drilling machine to reduce abrasion and friction on the core drilling bit while drilling the holes. Core samples are recorded on a sheet and placed in a box for future examination and analysis.

"Once the drilling is complete, a piezometer is placed in the hole. This instrument is used to measure the depth of ground water at different times during the year. Normally the top of the piezometer is cut off at ground level or it may extend any where from one to four feet above the ground."

What follows is a description of the role of the backhoe:

"Backhoe investigations are performed to find potential borrow material and to determine the best location for constructing the principal spillway (or overflow) pipe. Backhoe pits are about 3 feet wide, 12-14 feet deep, and approximately 20 feet long. A rubber tire backhoe machine is usually used to dig these pits.

"During excavation, soil from these pits is stockpiled next to the pits. Before the pits are backfilled, a government representative from the USDA, Soil Conservation Service, records the type and depth of soil material which is available at that pit. The holes are then backfilled. Seldom is one able to put all of the soil back into the pit. Therefore, the top of the pit is mounded to allow for future settlement.

"During the backhoe investigations, existing vegetation (ground cover) and/or crops may be damaged. With this understanding, the Elk Creek Watershed Steering Committee and the

local sponsors, namely, the Cecil Soil Conservation District, the Cecil County Commissioners, and the Town of Elkton, assume the responsibility for placing the ground back under vegetative cover. Furthermore, they realize it will be necessary to compensate landowners for damages to existing crops and/or any other damages which might occur.

"In performing these investigations it is necessary for daily travel to and from each investigation site on the property. The total elapsed time on each property depends on the number of drill holes and backhoe investigation pits. It is estimated that each drill hole will take from 3-4 days to complete. Each backhoe pit normally takes 2-3 hours to complete. During the operation of these geologic investigations, it is important to note that both the contractor and the Soil Conservation Service will make every effort possible to cause no more damage than is absolutely necessary."

Three core-drilling sites and 21 pit locations are shown on the topographic map filed as an exhibit. The pit locations are scattered over an area about one-half mile long and one-quarter mile wide. Most of them will be in open crop or pasture land. That the peace and tranquility of the area will be disturbed is beyond question. The heavy equipment required for the purpose will have to be moved over the fields and through the woodland. The property will be invaded by a steady stream of workmen and supervisors. Trees, brush, cover and some crops will be disturbed or destroyed.

The right of the appellees to do what they propose to do depends upon what we think the Legislature had in mind when it enacted Section 11 of SECTION 1 of Chapter 52 of the Laws of Maryland of 1963, now Code (1971 Repl. Vol.), Art. 33A, § 11, which provides as follows:

"(a) *Right of entry; right to set stakes, etc.*—Civil engineers, land surveyors and their as-

sistants acting on behalf of the State or of any of its instrumentalities or of any body politic or corporate having the power of eminent domain have the right:

"1. To enter upon any private land to make surveys, to run lines or levels, or to obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement, and

"2. To set stakes, markers, monuments, or other suitable landmarks or reference points where necessary.

"(b) *Order to permit entry.*—If any civil engineer, surveyor, or assistant to a civil engineer or surveyor is refused permission to enter or remain upon any private land for the purposes set out in subsection (a) hereof, any such person, or the State or its instrumentality, or the body politic or corporate upon whose behalf such person is acting may apply to a law court of the county in which the property or any part thereof is located for an order directing that such person be permitted to enter upon and remain upon such land to the extent necessary to carry out the purposes authorized by this section. Any person having knowledge of such order who obstructs any civil engineer, surveyor, or assistant to a civil engineer or surveyor who is acting under authority of such order may be punished as for contempt of the court.

"(c) *Damage to or destruction of property.*—If any civil engineer, surveyor, or assistant to a civil engineer or surveyor who has entered upon any private land under the authority of this section or of any court order passed pursuant thereto, damages or destroys any real or personal property thereon, the owner of such

property shall have a cause of action for such damages against such civil engineer, surveyor, or assistant and against the State, its instrumentality, or the body politic or corporate upon whose behalf the person inflicting such damage was acting.

"(d) *Obliterating, damaging or removal of stake, marker, etc.*—Any landowner or other person who wilfully obliterates, damages, or removes any stake, marker, monument, or other landmark set by any such civil engineer or surveyor acting pursuant to this section, except where such stake, marker, monument or other landmark interferes with the proper use of the property, shall be guilty of a misdemeanor and upon conviction shall be fined not more than five hundred dollars ($500.00)."

The trial judge, Roney, J., thought the phrase "to obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement" broad enough "to cover the right to make such tests." Accordingly Mackie was enjoined from taking any steps to bar the entry of the appellees upon his land.

It is entirely clear, we think, that since the words chosen by the Legislature do not circumscribe what one may do "to obtain information" their meaning is less than clear. Surely it is neither plain nor unambiguous. If we are to resolve this ambiguity or opacity, at least in respect of its impact on the case at bar, we must consider the facts of contemporary history, the prior state of the law, and what, if any, particular evil, abuse or defect § 11 was designed to correct and the remedy which was intended. *Clerk of the Circuit Court for Calvert County v. Chesapeake Beach Park, Inc.*, 251 Md. 657, 663 (1968); *Department of Tidewater Fisheries v. Sollers*, 201 Md. 603, 611 (1953).

It is difficult, perhaps impossible, to say what, if any,

rights civil engineers and surveyors may have had to enter upon private property prior to the Act of 1916, *infra.* In *Steuart v. Mayor and City Council of Baltimore,* 7 Md. 500, 516 (1855), Judge Eccleston, for the Court, said:

"Prohibition against taking private property until payment or tender of compensation is first made, and the right to have the amount of compensation settled by a jury or by agreement, are the important rights designed to be secured to the owners of property by the present constitution. And although the proposed street has been surveyed, the survey reported, and the damages and benefits assessed, yet the appellant's land has not been *taken,* in the legal sense of that word. *Bonaparte v. The Camden & Amboy Railroad Co.,* 1 *Baldwin's C.C. Rep.,* 226. The constitutional prohibition against taking private property for public use, until compensation is first paid or tendered, means *taking* the property from the owner, and *actually* applying it to the use of the public. It does not mean the preliminary measures necessary in such cases. To hold that compensation must be paid or tendered, before a survey should be made, or other preparatory steps taken, would be a construction of the constitution not required by its language, or necessary for the protection of private rights. It is quite a sufficient protection, if the owner is secured in the use and enjoyment of his property until the damages he may sustain are constitutionally ascertained, and paid or tendered. And until then, we think, a street cannot be opened or used, but an entry to grade, or to prepare the ground for that purpose, would be illegal; and the persons so entering would be responsible, in damages, to the owner of the property."

*Steuart* might have provided support for the notion that the City's surveyor had a right to go upon the property to run lines or levels but it could hardly have been put any higher. That seems to have been the state of the law from 1855 until the enactment of Chapter 649 of the Acts of 1916, Code (1951), Art. 33A. Sections 27, 28 and 29 of Art. 33A were as follows:

"§ 27. Civil engineers and surveyors, when they are in the employ of the State, or any County, or any city, town or village of the State, shall have the right to enter upon any private lands, or property for the purpose of making surveys, running lines or levels, or obtaining any needful information or data for the preparation of plans, reports or new legislation necessary for any proposed public sewerage system, water works, establishment of corporate boundaries or any extension of the same, highways or improvements thereto, or any public undertaking of like nature.

"§ 28. Civil engineers and surveyors, when acting under the authority of this subtitle, shall not damage or destroy any property or lands entered by them in the performance of their work, but they shall have the right to set stakes, markers or monuments or other suitable landmarks or reference points where necessary.

"§ 29. No owner, occupant or agent of private lands so entered shall obstruct, impede or annoy civil engineers or surveyors, or their employees, in the performance of their work under this subtitle, nor shall any such owner, occupant, or agent, destroy, obliterate or remove any stakes, markers, monuments or other landmark set or placed by such civil engineers or surveyors; and any owner, occupant or agent violating the provisions of this subtitle, shall be guilty of a misdemeanor, and subject to a fine

of not less than Twenty-five Dollars ($25.00), nor more than One Hundred Dollars ($100.00), or to imprisonment for not less than thirty days nor more than sixty days, or both, in the discretion of the Court."

Mackie argues, correctly we think, that the operation contemplated by the appellees would have been utterly impermissible at common law, particularly in a climate where "[t]he sacredness of the rights of property is everywhere recognized by the spirit of the common law, Magna Carta and our Bill of Rights." *Moale v. Mayor and City Council of Baltimore,* 5 Md. 314, 321 (1854). And, of course, any statute permitting such operations would be in derogation of the common law. Nothing is more firmly established than the rule that such statutes must be strictly construed. *Chudliegh's Case,* 1 Coke Rep. 113 b, 134 a, 76 Eng. Repr. 261, 303 (K.B. 1595) ; *Brown v. Barry,* 3 U. S. (3 Dall.) 365, 367 (1797) ; *Stoll v. Mayor and City Council of Baltimore,* 163 Md. 282, 293 (1932) ; 3 *Sutherland Statutory Construction* § 5502 (3d ed. Horack 1943).

The juxtaposition, in the 1916 statute, of the general phrase to obtain "any needful information" and the specific itemization of such acts as making surveys, running lines or levels, setting stakes, markers, monuments and reference points suggests, as appellant argues, the application of the maxim *ejusdem generis,* sometimes called Lord Tenterden's Rule. In *Smith v. Higinbothom,* 187 Md. 115, 129-30 (1946), we put it this way:

"* * * A narrow construction is permissible under the established rule of *ejusdem generis* that where general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. This rule is based on the supposition that if the Legislature

> had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things."

Assuming the rule of *Smith* to be apposite here, then by the enumeration of specific activities the Legislature must have meant the general language, to obtain "any needful information," to embrace only the activities mentioned and activities of the same kind and character. Clearly they are innocuous and temporary effecting only minimal incidental damage and little, if any, disturbance. This seems entirely consistent with the specific mandate that "civil engineers and surveyors * * * shall not damage or destroy any property or lands entered by them in the performance of their work." And it would surely seem to follow that the Legislature did not equate the placing of stakes and markers, etc., with damage or destruction. One is obliged to conclude that what the appellees contemplate doing on Mackie's land would have been beyond the scope of the 1916 statute.

The question arises then, does the 1963 revision, Section 11, confer upon the appellees a license to do things which they could not have done under the 1916 statute. The specifically enumerated activities are the same. The only change of material significance is that the clause prohibiting damage or destruction has been replaced with subsection (c) establishing a cause of action for whatever damage or destruction may occur. Although it is nowhere spelled out we think it unlikely that the landowner would have been without a cause of action prior to 1963. *Murphy v. State Road Comm'n*, 159 Md. 7, 19 (1930). We cannot read into Section 11 an intention by the Legislature to accomplish anything more than a recognition that the landowner is entitled to be made whole for the incidental destruction or damage associated with the innocuous acts and entries specified in subsection (a), 1 and 2 of Section 11, thereby dispelling the uncertainty of the 1916 law. We must reject the notion that it intended to license operations which would inflict upon private property the trauma proposed by the appellees.

The cases, for the most part, have upheld statutes similar to the 1916 law. *See, e.g., State v. Simons,* 145 Ala. 95, 40 So. 662 (1906); *Jacobsen v. Superior Court of Sonoma County,* 192 Cal. 319, 219 P. 986 (1923); *Cushman v. Smith,* 34 Me. 247 (1852); *Wood v. Mississippi Power Co.,* 245 Miss. 103, 146 So. 2d 546 (1962); *State v. Seymour,* 35 N.J.L. 47 (1871); 2 *Nichols on Eminent Domain* § 6.11 (rev. 3d ed. 1970). Even in the absence of a statute the right to enter upon private property to make surveys has been recognized. *See, e.g., Winslow v. Gifford,* 60 Mass. (6 Cush) 327 (1850). *But see Iowa State Highway Comm'n v. Hipp,* 259 Iowa 1082, 147 N.W.2d 195 (1966). Other than what was said in *Steuart, supra,* we seem not to have undertaken a delineation of the outer limits of "preliminary measures." *See generally LaFontaine's Heirs v. LaFontaine's Heirs,* 205 Md. 311, 320 (1954). A statute much like Section 11 was before the Alabama court in *Dancy v. Alabama Power Co.,* 198 Ala. 504, 73 So. 901 (1916). The landowner was held to be entitled to an injunction restraining the power company from cutting timber or destroying crops beyond whatever was necessary for the completion of a survey. The court said:

> "All that the statute contemplates—all that it could validly contemplate—in respect to damage consequent upon the entry and examinations and surveys on the land is such as is inflicted necessarily by the entry and movement of surveyors over the land and in the efficient use of their instruments to effect the purpose in view. This may include the tramping down of herbage and the minimum of injury to growing crops; but in no event can it rightfully include the injury or destruction of any form or character or amount of growing trees or timber." 73 So. at 902.

In *Jacobsen v. Superior Court of Sonoma County, supra,* the issue presented to the court was not significantly dif-

ferent from the issue now before us. Justice Richards, for the court, wrote:

"* * * [I]t is clear that whatever entry upon or examination of private lands is permitted by the terms of this section cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property." 219 P. at 991.

It has been suggested that there has been some dilution of *Jacobsen* in *County of San Luis Obispo v. Ranchita Cattle Co.,* 16 Cal. App. 3d 383, 94 Cal. Rptr. 73 (1971), but if so it must, like beauty, be in the eye of the beholder. We see no attenuation of *Jacobsen. Morris & E. R. Co. v. Hudson Tunnel R. Co.,* 25 N.J.Eq. 384, 386 (1874), also supports the notion that drilling and tunneling are beyond the scope of a statute authorizing entry for surveys, running levels and explorations. A contrary result was reached in *Puryear v. Red River Authority,* 383 S.W.2d 818 (Tex. Civ. App. 1964), where only core drilling was involved but we find ourselves unpersuaded by it.

Mackie argues also that what the appellees propose to do amounts to a "taking" within the meaning of Section 40 of Article III of the Maryland Constitution for which compensation must be determined and paid *prior* to entry. While we expressly refrain from so holding, that quite well may be the practical effect of our decision today which, it must be understood, goes no further than a determination that the learned judge below erred when he held that Section 11 empowered the appellees to do what they propose to do on Mackie's property.

There is no blinking the fact that public agencies must, from time to time, have the kind of information which can be obtained only by the sort of activities pro-

posed by the appellees if public works are to be accomplished efficiently and economically. Indeed Mackie agrees that he must yield to the contemplated intrusions but only if and when an easement for the purpose is first condemned. In this regard Mackie reminds us that in *State Roads Comm'n v. Jones,* 241 Md. 246, 250 (1966), we quoted with approval the statement of Mr. Justice Holmes, taken from *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, 415-16 (1922), and which bears repetition here:

> "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. *Hairston v. Danville & Western Ry. Co.,* 208 U. S. 598, 605. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears."
>
> \* \* \*
>
> "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

We shall not undertake to say here that prior payment or the tender of payment is a *sine qua non* for entries and activities looking to the acquisition of the "information" appellees say they must have. It seems reasonable to suppose that the Legislature will devise a mechanism which will be adequate, equitable and valid.

This appeal was accompanied by the appeal of Joseph Mackie, whose land adjoins Mackie's land. His case presents precisely the same situation presented by Mackie's

case and the order in Joseph Mackie's case will be reversed for the reasons stated in this opinion.

*Orders reversed.*
*Costs in both cases to be paid*
*by the appellees.*

*Hammond, J., dissenting:*

I think that Judge Roney correctly interpreted the statute and that the landowner's constitutional right not to have his property taken without payment of fair compensation is fully guarded by the provisions of the statute that make both the agent of the State and the State liable in damages (to be set judicially) for destruction of or damage to any real or personal property of the owner. I would affirm. Judge Smith concurs.