**CITY OF NORTHGLENN, Colorado,**
**Petitioner/Cross–Respondent,**

v.

**Jack J. GRYNBERG, Respondent/Cross–**
**Petitioner.**

No. 91SC767.

Supreme Court of Colorado,
En Banc.

Feb. 16, 1993.

As Modified March 8, 1993.

Herbert C. Phillips, James S. Maloney, Hayes, Phillips & Maloney, P.C., Denver, for petitioner/cross-respondent.

Phillip D. Barber, Keith D. Tooley, Welborn Dufford Brown & Tooley, P.C., Denver, for respondent/cross-petitioner.

Patricia L. Wells, Henry C. Teigen, Casey S. Funk, Asst. City Attys., Denver, for amicus curiae the City and County of Denver acting by and through its Board of Water Com'rs.

Kathleen E. Haddock, Denver, for amici curiae Colorado Mun. League and the City and County of Denver acting by and through its Board of Water Com'rs.

Peter J. Wall, John D. Amen, Burns, Wall, Smith and Mueller, P.C., Denver, for amicus curiae Independent Petroleum Ass'n of Mountain States.

Justice MULLARKEY delivered the opinion of the Court.

We issued a writ of certiorari to review the court of appeals decision in *Grynberg v. Northglenn*, 829 P.2d 473 (Colo.App. 1991) (*Grynberg II*), affirming an inverse condemnation judgment in favor of the plaintiff, Jack J. Grynberg, against the defendant, the City of Northglenn, which constructed a 6,000 acre-foot wastewater reservoir on land overlying part of Grynberg's mineral lease. The trial court found that Grynberg's property had been taken or damaged, and a jury of freeholders awarded him $646,930, plus interest, costs and attorney fees for a total of $862,155.05.

This action is before this court for the second time. In *Grynberg v. City of Northglenn*, 739 P.2d 230 (Colo.1987) (*Grynberg I*), we held that Grynberg had a claim for geophysical trespass against the City of Northglenn for a test hole that Northglenn drilled into Grynberg's mineral estate in preparation for Northglenn's construction of the reservoir. We remanded the case to the trial court to develop a record and to consider affirmative defenses, such as governmental immunity.

On remand, Grynberg abandoned his tort claims, including the geophysical trespass claim, and proceeded on a theory of inverse condemnation. Pursuant to section 38–1–101, 16A C.R.S. (1982 & 1992 Supp.), the trial court determined all questions and issues except the amount of compensation, including that a taking or damaging had occurred. After a trial on damages to a jury of freeholders pursuant to section 38–1–106, Grynberg was awarded the amount described above and the verdict was affirmed by the court of appeals. We reverse.

## I.

The facts as developed at trial after remand are essentially the same as those detailed in our previous opinion. *See Grynberg I*, 739 P.2d at 232–33. Other relevant facts will be described as appropriate in this opinion.

After remand, the trial court dismissed the tort claims against Northglenn. Grynberg elected to abandon his tort claims [1] and successfully proceeded on a theory of inverse condemnation. Northglenn appealed the verdict, which was affirmed by the court of appeals in *Grynberg II*, 829 P.2d 473. We granted Northglenn's petition for writ of certiorari on two issues: (1) whether the court of appeals erred in holding that the inability to mine under the reservoir and its embankment, the drilling of test holes, and the filing of a report constitute a taking within the meaning of Article II, Section 15 of the Colorado Constitution; and (2) whether the court of appeals erred in finding the evidence presented at trial was sufficient in law and fact to support the jury's verdict. We also granted Grynberg's cross-petition for writ of certiorari on the issue of whether Article II, Sections 15 and 25, of the Colorado Constitution require that the prejudgment interest awarded to Grynberg on his inverse condemnation judgment be calculated from the date of the taking of his property by the City of Northglenn. Because we conclude that there was no constitutional taking or

---

1. Although, in his Opening Brief, Grynberg states that he did not "abandon" the tort claims, the fact is that the trial court dismissed them and Grynberg did not appeal this dismissal.

damaging, we reverse on the first issue and do not address the other two issues.

## II.

Article II, Section 15 of the Colorado Constitution provides, in relevant part: "Private property shall not be taken or damaged, for public or private use, without just compensation." Inverse condemnation actions, as well as eminent domain actions, are based on this section. *Ossman v. Mountain States Tel. & Tel. Co.*, 184 Colo. 360, 365, 520 P.2d 738, 741–42 (1974). Because an inverse condemnation action is based on the "takings" clause of our constitution, it is to be tried as if it were an eminent domain proceeding. *Id.* at 366, 520 P.2d 738. Section 38–1–101, 16A C.R.S. (1982 & 1992 Supp.),[2] provides that, in an eminent domain proceeding, the only issue that goes to the jury is the amount of compensation to be awarded. It is for the trial court alone to decide whether a taking has taken place. Prior to opening statements in this case, the trial court ruled that a taking had occurred. The ruling was based on the statements of counsel and stipulated facts as detailed in *Grynberg I*, although the trial court reserved the right to revisit its ruling. After the jury verdict, the trial court did not alter the initial ruling. However, the court made some statements revealing its uncertainty about the ruling:

> Okay this is a road we travelled down a number of times in the course of this, and it is somewhat comforting to know that whatever I decide here, I'm sure I will not be the last word on the subject. If we had a scale of zero to ten and zero meant I was sure I was wrong and ten meant I was sure I was right, we would be at a point of about 5.1 on that scale, and perhaps 5.01 as to what I'm going to do.

The facts that developed at trial, relative to the issue of whether a taking or damaging

has occurred, were undisputed.[3] Under these circumstances we will first determine the applicable legal standard and then apply that standard to determine whether a constitutional taking or damaging has occurred. *People ex rel. Woodard v. Colorado Springs Bd. of Realtors, Inc.*, 692 P.2d 1055, 1068 (Colo.1984) (appellate court may apply proper legal standard to uncontroverted facts).

Ownership of the surface and mineral estates of the land at issue was severed at some time prior to the relevant events in this case. As part of his business exploring and prospecting for minerals, Grynberg leased the right to explore for coal in Section 36 (640 acres of land) for $640 per year from the State of Colorado which owned the mineral estate. He bought the coal lease from the state with the hope of selling all or some of the rights to explore and mine coal from the leasehold, or to mine the leasehold himself. Although Northglenn purchased the surface estate from the previous owner, it did not purchase or seek to condemn the mineral estate.

A taking occurs when an entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property. *See Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992) (when owner called upon to sacrifice all economically beneficial uses of real property to the common good, owner has suffered a taking). *See also Lipson v. Colorado State Dep't of Highways*, 41 Colo.App. 568, 569, 588 P.2d 390, 391 (1978) (quoting *City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971)) (requirements for a *de facto* taking are "a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposi-

---

**2.** Section 38–1–101 was amended in 1984. Ch. 263, sec. 1, § 38–1–101, 1984 Colo.Sess.Laws 972, 972. The amendment is not material to the result reached here.

**3.** There was a great deal of controverted testimony. However, that testimony was relative to the amount of damages, the question before the jury, rather than the occurrence of a taking or damaging, the question before the trial court.

tion of the property."). To be entitled to compensation under the state constitution, there must be either a taking or a damaging of private property without just compensation.

■ It has been said that by including damaging in the just compensation provision, the Colorado Constitution affords an aggrieved property owner a greater measure of protection than does the Constitution of the United States. *Mosher v. City of Boulder*, 225 F.Supp. 32, 35 (D.Colo. 1964). Even without a "damage" provision in the relevant constitution or statute, the takings clause has been interpreted to compensate a property owner for incidental injury to the remainder of the property caused by a taking of some but not all of the property. *La Plata Elec. Ass'n, Inc. v. Cummins*, 728 P.2d 696, 698 (Colo.1986);[4] *see also* 4A Julius L. Sackman, Patrick J. Rohan, *Nichols on Eminent Domain* § 14.02[1] at 14–29 (1993). For example, under a pure takings clause (such as that in the United States Constitution), no compensation would be due to a property owner for injury caused by a highway built on property immediately adjacent to a property owner's land, while an owner who had only a minuscule portion of his or her property taken for such a highway would be due compensation. Such a result may well be inequitable, *see La Plata Electric* at 705 (Rovira, J., dissenting), but the same result would be reached if a private landowner built an improvement at the boundary of his or her property. The intent of including the word "damaged" in the constitution was to grant relief to property owners who had been substantially damaged by the making of such public improvements abutting their lands, but whose land had not been physically taken by the government. *See City of Pueblo v. Strait*, 20 Colo. 13, 18, 36 P. 789, 791 (1894).

Most of this court's cases construing this provision of our constitution have dealt with governmental obstruction of ingress and egress to property, *see, e.g., id.* (building of a viaduct eight feet above a public street); *State Dept. of Highways v. Interstate–Denver West*, 791 P.2d 1119 (Colo. 1990) (one of two access points to public streets taken by condemnation); *Troiano v. Colorado Dept. of Highways*, 170 Colo. 484, 463 P.2d 448 (1969) (building of Interstate 70), or extraordinary changes in the use of a street. *Denver Circle R.R. Co. v. Nestor*, 10 Colo. 403, 15 P. 714 (1887) (building a steam railroad in public street); *City of Denver v. Bayer*, 7 Colo. 113, 2 P. 6 (1883) (same). *See also Game and Fish Comm'n v. Farmers Irrigation Co.*, 149 Colo. 318, 369 P.2d 557 (1962) (release of pollution from a fish hatchery, polluting domestic water supply of downstream users, states a claim for a "damaging" of private property for public use).

■ To recover in a damaging case, then, the owner must show a unique or special injury which is different in kind from, or not common to, the general public. The damage must be to the property or its appurtenances, or it must affect some right or interest which the owner enjoys in connection with the property and which is not shared with or enjoyed by the public generally. In no case has mere depreciation in value been grounds to award just compensation for a damaging of property. In none of our previous cases have we held the acquisition of an already-severed surface estate, or preliminary site preparation activities, or the mere filing of a report, without more, to be sufficient for recovery for a "damaging" of property for the purposes of Article II, Section 15.

We refuse to reconsider the long-standing construction of this constitutional provision that compensation is not due to a property owner merely if that person's property value is depreciated by government action. In light of the judicial abrogation of governmental and sovereign im-

---

**4.** Although it is true that this court was late in adopting this rule in *La Plata Electric*, this is the majority rule in the United States. *See id.* at 700 n. 3. In *La Plata Electric*, we held that a landowner must be compensated for all damages that are the natural, necessary and reason-able result of a partial taking. Proof that a property owner incurred damage which differs in kind from the damage suffered by the general public, however, remains a requirement for inverse condemnation cases alleging damage when no property is taken. *Id.* at 701–02.

munity, *Evans v. Board of County Comm'rs*, 174 Colo. 97, 482 P.2d 968 (1971), and the enactment of the Governmental Immunity Act, sections 24–10–101 to –120, 10A C.R.S. (1988 & 1992 Supp.), there is no reason to enlarge the scope of constitutionally compensable damagings of property.[5] *See Kratzenstein v. Board of County Comm'rs*, 674 P.2d 1009, 1010 (Colo.App. 1983) (noting that early Colorado decisions favored inverse condemnation proceedings in public improvement cases). With these principles in mind, we turn to Grynberg's contentions.

### III.

Grynberg alleges that, by the following actions, Northglenn has taken or damaged his coal lease: (1) the acquisition of the surface estate over his coal lease; (2) the drilling of one 600–foot core hole by Northglenn's contractor Chen and Associates, Inc. (Chen) as part of a geotechnical engineering survey of the parcel; and (3) the publishing of the Chen report stating that there were no commercially exploitable coal reserves in Grynberg's coal lease. We will discuss each contention with respect to Grynberg's taking claim and then consider his damaging claim.

### A.

█ Grynberg first argues that Northglenn took Grynberg's property by the acquisition of the surface estate for the west half of Section 36. Grynberg argues that our holding in *William E. Russell Coal Co. v. Board of County Comm'rs*, 129 Colo.

330, 270 P.2d 772 (1954), controls this question, and that, therefore, Northglenn's acquisition of the surface estate amounts to a taking. While we agree that *Russell Coal* is a controlling case, we do not agree that there was any taking here.

In *Russell Coal*, the Board of Commissioners of Boulder County and the State Highway Department condemned only the surface estate of property which, along with the mineral estate, belonged to a coal mining company. The coal company argued that there had been a taking of its mineral estate because: this condemnation severed the surface estate from the mineral estate; the subjacent support required by the surface estate so as not to cause subsidence would not allow the company to mine certain of the coal in place; and the cost would be greater to mine the coal that it could extract. *Id.* at 334–35, 270 P.2d at 773–774. The highway department argued that it did not seek to acquire subjacent support for its highway right-of-way, and would waive or release this right. We held that, because the mining company legally owed the highway department this duty of subjacent support, and the highway department could not waive this right, which was for the benefit of the public in general, the coal company was entitled to just compensation for the servitude placed on its remaining property, i.e., the mineral estate, which was not taken by eminent domain. *Id.* at 335–36, 270 P.2d at 775.[6]

Here, however, the surface and mineral estates had been severed before either

---

5. This does not mean that a *taking* is not effected where government action results in a permanent occupation of property, or the loss of all economically beneficial or productive use of land. *See, e.g., Lucas v. South Carolina Coastal Council,* —— U.S. ——–——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987).

6. *Russell Coal* was a takings case, not a damage case. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Compensation under takings law was clearly

awardable to the mining company there for two reasons. First, and simplest, part of the property was forcibly conveyed, as appurtenant to the newly-severed surface estate. The property so conveyed was the support easement which we held is conveyed, as a matter of law, to the surface estate owner when the surface and mineral estates are severed. Second, the taking of the surface estate in *Russell Coal* was a partial taking and, under general takings law (without reverting to a constitutional prohibition of "damage" to private property without compensation), a property owner is entitled to compensation for injury to the remainder of the property. *La Plata Electric,* 728 P.2d 696. The term "damage" was used by the *Russell Coal* court in the nontechnical sense of injury.

Grynberg or Northglenn came into contact with the parcel. Even before Northglenn acquired the surface estate, the owner of the mineral estate owed a duty of subjacent support to the owner of the surface estate. When Northglenn purchased the surface estate, one of the "bundle of rights" Northglenn acquired was the previous owner's right to demand subjacent support from mineral estate, albeit only for the land in its natural state.[7] As we stated in *Russell Coal*, "when a separation of the surface rights from mineral rights has occurred, in the absence of an express agreement otherwise, the duty of mineral estate is bound to support the surface." *Id.* at 335, 270 P.2d at 774. *See Victor–American Fuel Co. v. Wiggins*, 746 P.2d 58, 59–60 (Colo.App.1987) ("When the surface and mineral estates have been severed, the mineral estate owner may remove the minerals, but he must support the surface."); *Smith v. Moore*, 172 Colo. 440, 474 P.2d 794 (1970) (same). Therefore, when Northglenn acquired the surface estate, the obligation of the mineral estate owner to provide subjacent support to the surface estate owner was one of the "bundle of rights" acquired by Northglenn along with title to the surface estate for the west half of Section 36. Grynberg, as the lessee,

was bound by the mineral estate owner's duty of support so that Northglenn's purchase of the surface caused no change to him; Grynberg lost nothing that he had had previously. Northglenn's acquisition of the surface estate had absolutely no effect on Grynberg's property rights as lessee of the mineral estate because Grynberg was not prevented from exploring or mining coal lying under the proposed site of the reservoir.[8] The surface estate was cultivated farmland both before and after it was purchased by Northglenn.

Furthermore, even assuming that construction of the reservoir on the surface estate affected the duty of access of the mineral estate owner or made that owner unable to mine the coal lying at a certain depth under the reservoir and the embankment, this question is not before the court. By the time Northglenn began site preparation for the reservoir, Grynberg had conveyed the mineral lease to his wife who is not a party to this action.

### B.

 Grynberg next argues that a taking was effected by Northglenn's unauthorized drilling of a 600–foot test hole to determine if there were commercially ex-

---

7. Once the reservoir had been built, the owner of the mineral estate would still owe only a duty to support the surface in its *natural* state, and would be strictly liable for subsidence resulting from mining operations under the reservoir only if the subsidence would have occurred even if the land had remained in its natural state. *Gladin v. von Engeln*, 195 Colo. 88, 92, 575 P.2d 418, 421 (Colo.1978). *See also Restatement (Second) of Torts* §§ 820–21 (1979) (withdrawal of subjacent support). Although a subsurface owner may be liable in negligence for withdrawing subjacent support of artificial additions to land, *id.* § 821, soil has a greater specific gravity than water, and there is no evidence in the record that water from a reservoir would seep deep enough into the ground to interfere with mining operations. *See also id.* § 820, cmt. d ("Subjacent support that is not naturally necessary is nearly always support for artificial conditions on the surface. The weight of the supported artificial additions is generally slight compared with the weight of the supported land.... The burden is placed on the defendant actor of introducing evidence that the land would not have subsided if there had been no artificial additions on it.").

Even if we did conclude that the acquisition of the surface brought about a taking (or damaging) of Grynberg's coal lease to the extent that it was forced to support a reservoir, we could not affirm the trial court's judgment. There was no evidence before the jury as to how much coal from a hypothetical mining operation under Section 36 would be required to remain in place to support a reservoir as then proposed by Northglenn; the jury's valuation, to the extent the acquisition of the surface allegedly was a taking, was purely speculative.

8. Grynberg also argues that Northglenn's activities beginning in 1978, including exploratory drilling, and acquisition of the surface, constituted "construction" of the reservoir. While we do not express an opinion on whether such preparatory activities constitute "construction," Grynberg makes no showing that such activities interfered with his access or property rights to the mineral estate or that he was unable to explore for or to mine coal from the property at any time up to and including March 3, 1980, when he assigned his coal lease to Celeste C. Grynberg, his wife.

ploitable coal reserves and to investigate potential subsidence problems below the proposed reservoir site. The hole in question (as well as another hole drilled on another section not leased to Grynberg) was drilled at the direction of Chen, one of Northglenn's subcontractors, which did an engineering geology and soils investigation for the proposed reservoir. More specifically, Grynberg complains that his property was taken by Northglenn's acquisition of proprietary information belonging exclusively to Grynberg by virtue of his ownership of the coal lease and Northglenn's subsequent publication of that information. We do not agree.

■ Initially we note that the drilling of the test hole in and of itself does not effect a taking. Although the digging of the test hole was a physical invasion of Grynberg's real property, it did not rise to the level of a taking. A taking can be effected by a legal interference with the physical use, possession, enjoyment, or disposition of property, or by acts which translate to an exercise of dominion and control by a governmental entity. *Lipson v. State Dep't of Highways*, 588 P.2d 390, 391–92 (Colo.App. 1978). The drilling itself did not interfere with Grynberg's use, possession, enjoyment, or disposition of his coal lease. The drilling of the test hole, a single, transitory physical invasion of Grynberg's coal lease, does not translate to an exercise of dominion and control of the coal lease.[9] *See Puryear v. Red River Auth. of Texas*, 383 S.W.2d 818 (Tex.Civ.App.1964) (core drilling without authorization held not a taking).

■ While the drilling itself clearly does not effect a taking, the information derived from that drilling presents a more complex question. An owner of mineral rights has a property interest in the proprietary information which can be gathered by way of geophysical exploration of his or her land. *Grynberg I*, 739 P.2d at 236–37. *See Ruckelshaus v. Monsanto*, 467 U.S. 986, 1001–04, 104 S.Ct. 2862, 2872–74, 81 L.Ed.2d 815 (1984) (owner of trade secret has property right, protected by the Fifth Amendment, in that trade secret). Much of the value of an unexplored coal lease is that information regarding the coal is unknown. An owner, who may not have the wherewithal to mine or to explore for minerals, may be able to make a substantial profit by selling an option to mine the minerals to someone who does possess the resources to explore or mine the minerals.[10] *Grynberg I* at 237 (quoting *Layne Louisiana Co. v. Superior Oil Co.*, 209 La. 1014, 26 So.2d 20, 22 (1946)). This presupposes, however, that the property owner has exclusive or near-exclusive access to the mineral information.

■ Here, Grynberg never had exclusive or near-exclusive access to information about the geological conditions including minerals under Section 36. Section 36 is part of the Boulder–Weld coalfield, which has been mined since the Civil War. In 1966, the United States Bureau of Mines published a report entitled *Analysis of the Coal Industry in Boulder–Weld Coalfield, Colorado*. This report included an isopach or equal-thickness contour map showing estimated coal thicknesses in the Boulder–Weld coalfield; the coal thickness in Section 36 is shown as 2.5 feet or less.[11] A defense expert, whose testimony was not contradicted, stated that the United States Geological Survey (USGS) established a

9. Grynberg cites three cases from other jurisdictions to support his contention that unauthorized drilling and exploration constitute a taking and damaging of his property rights. *Jacobsen v. Superior Court*, 192 Cal. 319, 219 P. 986 (1923); *Mackie v. Mayor & Comm'rs of Elkton*, 265 Md. 410, 290 A.2d 500 (1923); *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991). None of these cases is on point. All involve owners of the surface estate, extensive excavation of the property, and long-term occupation of the land.

10. While, in *Grynberg I*, we held that a person has a cause of action arising out of unlawful geophysical exploration, we did not reach any conclusions about the scope of recovery in such an action.

11. This report, as well as certain other exhibits, were entered into evidence, but not included in the record on appeal. However, the narrative description of these exhibits was uncontradicted, and is sufficient to make this conclusion.

standard in 1973 that coal had to be at least 2.5 feet thick to be considered a resource, and that sub-bituminous coal 2.5 to 5 feet thick was a sub-economic resource, i.e., that it was not thick enough to mine economically.[12] The USGS and Adolph Coors Co. previously had drilled test holes in Section 36. Both the USGS and Coors drilled two holes each; the USGS was searching for groundwater and Coors was searching for coal.[13] The Coors holes, drilled in the southern and southeastern part of Section 36, showed 5 and 3 feet of coal, respectively. The USGS holes, drilled in the northwestern part of Section 36, showed 5 foot and 6.6 foot thick coalbeds. The 6.6 foot thickness, however, included a 1.6 or 1.7 foot shale parting, which would leave only 4.9 or 5 feet of coal. Schaeffer and Roland, Inc., Northglenn's general contractor, obtained the geological logs from these test holes, as well as those from seven other holes drilled on nearby sections, and provided them to Chen for use in preparing Chen's engineering geology and soils investigation report. Chen used these logs, along with the data derived from the hole sunk by Chen.[14] The USGS logs were in the public domain, and the other logs obviously were readily available to an interested party.

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Court held that trade secrets[15] are property entitled to protection under the Fifth Amendment's Takings Clause.

*Id.* at 1003–04, 104 S.Ct. at 2873. The Court explained that

> [b]ecause of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. Information that is public knowledge or that is generally known in an industry cannot be a trade secret. If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.

[citations omitted]. *Id.* at 1002, 104 S.Ct. at 2872. "Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data." *Id.* at 1011, 104 S.Ct. at 2877.

The record does not indicate that the Chen drilling log data contained any information different in kind from the drilling logs from the previous exploration holes or from other publicly available information. Robert L. Sprinkel, Jr., a defense expert geologist with almost sixty years of experience in mineral evaluation, testified that, using the information available in 1966, he would have estimated that the sub-economic coal resources in Section 36 totalled about 35,000 tons. A sub-economic resource refers to a coal bed 2.5 to 5 feet

**12.** Another defense expert, Louis A. Gaz, with 28 years experience as a geologist, including nine years of experience in mining in the Boulder–Weld coalfield, testified that, in the late 1970s, companies mining in the Boulder–Weld coalfield mined coal seams eight to ten feet thick, and had to leave three feet of coal in place as a roof to prevent cave-ins.

**13.** The USGS drilled with Grynberg's permission in late 1977. Coors was the assignee of a previous coal lease to Clayton Coal Company and drilled its holes in March of 1973. Coors abandoned the lease after concluding that any coal within the leasehold boundaries was not economically recoverable. *Grynberg I*, 739 P.2d at 232.

**14.** Chen contracted with Cameron Engineers for the drilling and logging of the two holes drilled to determine the potential for recoverable coal reserves underlying Section 36. The Cameron

report to Chen, which concluded that there were no commercially exploitable coal reserves under the reservoir site, was appended to the Chen report.

**15.** Under the Uniform Trade Secrets Act, §§ 7–74–101—7–74–110, 3A C.R.S. (1986), trade secrets are defined as:

> [T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes. § 7–74–102(4).

thick which, according to the USGS, cannot be economically mined.[16] With the addition of the Coors log information, this estimate of total resources would have increased to 2.4 million tons, including about 250,000 tons of economic resources, that is, coal seams over five feet thick. Finally, with the addition of the USGS and Chen holes, this estimation of total resources increases to about 4.5 million tons, with economic resources of about a half-million tons. Although Sprinkel did not prepare an exhibit of his estimate of resources without the Chen report, he testified, without contradiction, that the information from the Chen hole "did not have much impact. It ... didn't change the amount of coal in general of three feet of coal in the area of where it was drilled."

Thus, the conclusion reached by the Chen report that coal mining under Section 36 was not commercially feasible was not based on proprietary or secret information gained as a result of the exploratory hole drilled by Chen in Section 36. The same basic information was contained in the Bureau of Mines report, as well as the USGS and Coors drilling logs, and Grynberg has failed to prove that the Chen report infringed on a trade secret or on otherwise exclusive proprietary information.[17]

### C.

Grynberg's third argument is that the filing of the Chen report constitutes a taking. We do not agree.

▬▬ As an initial matter, the court of appeals previously has held that "the mere announcement of impending condemnations, coupled as it may well be with substantial delay and damage, does not, in the absence of the acts which may be translated into an exercise of dominion and control by the condemning authority, constitute a *taking* so as to warrant awarding compensation." *Lipson v. State Dep't of Highways,* 41 Colo.App. 568, 570, 588 P.2d 390, 391–92 (1978) (emphasis in original). Similarly, the mere publication of a report that states that a leaseholder's leased property does not have commercially exploitable coal reserves is not, by itself, a taking of property. Second, as explained above, we conclude that the information in the Chen report was not proprietary information, and therefore disclosure of such information cannot be a taking of a trade secret.[18] Therefore, Grynberg's only remaining complaint about the Chen report is that it was not accurate.[19] To the extent that Grynberg has a claim based on the inaccuracy of the Chen report, such a claim lies in tort or could lie in tort. *Desert Truck Sales v. Denver,* 837 P.2d 759, 765 (Colo.1992). The State of Colorado and its political subdivisions have not waived sovereign immunity for such a claim.[20] § 24–10–106, 10A C.R.S. (1988 & 1992 Supp.).

### D.

▬ Finally, we determine that Grynberg has not made out a case showing a

16. The defense witnesses were impeached as to their ignorance as to whether or not such a thickness of coal was truly not economical to mine.

17. While we do not decide here whether geophysical information in general may or may not be a "trade secret," the amount of information publicly available regarding the coal reserves under Section 36 clearly shows that Grynberg's access to the information was not sufficiently exclusive to qualify as a trade secret, especially in light of the fact that the Chen hole's results, i.e., that the coal thickness was approximately three feet thick, were in agreement with all the publicly available information.

18. As stated above, we do not decide here whether or not the information as represented by the undiscovered data from an unexplored mineral lease is a "trade secret" or other proper-

ty which is protected by the federal or state constitutions.

19. Even though the Chen report contained inaccuracies, such as stating that the coal thicknesses under the proposed reservoir site was .5 to 2.5 feet thick, rather than 2.5 to 5 feet thick, the report's general conclusions appear to be in accord with the Bureau of Mines report and Coors' conclusion that the coal was not economically minable in the late 1970s and 1980.

20. We realize that an inverse condemnation claim arising from, for example, a physical occupation and ouster of the owner of real property, may lie in trespass as well, and would appear to come under the Governmental Immunity Act, §§ 24–10–101—24–10–120, 10A C.R.S. (1989 & 1992 Supp.). *See Ossman v. Mountain States Tel. & Tel. Co.,* 184 Colo. 360, 520 P.2d 738 (1974). Without stating today where (or even

constitutional damaging of his property. While it does appear that his coal lease was diminished in value, this is not sufficient. During the relevant time, Northglenn did not change the character of the use of the surface estate or other neighboring property. *See Denver Circle R.R. Co. v. Nestor,* 10 Colo. 403, 15 P. 714 (1887). From the time that Grynberg obtained the coal lease until the time that he conveyed the coal lease to his wife, the surface was used as agricultural land. Northglenn did nothing which would have impaired Grynberg's exploration for or mining of coal in the coal lease.

Furthermore, there is no evidence that Northglenn obstructed Grynberg's ingress or egress to his property. There is no evidence that Northglenn's acts affected a right or interest he enjoyed in connection with his property which is not shared with or enjoyed by the public generally. In other words, the law of constitutional damagings does not apply to the undisputed facts of this case.

### IV.

We conclude that Grynberg did not prove a taking or damaging of his property pursuant to Article II, Section 14 of the Colorado Constitution, by Northglenn's acquisition of the surface estate, the drilling, or the publication of the Chen report. Because there was no taking or damaging of Grynberg's property, we reverse the judgment of the court of appeals and remand the case with directions to return the case to the district court for the dismissal of Grynberg's inverse condemnation action.

ERICKSON, J., specially concurs in the result and KIRSHBAUM, J., joins the special concurrence.

SCOTT, J., does not participate.

---

Justice ERICKSON Specially concurring in the result:

I agree that in this case, private property was not unconstitutionally taken or damaged under article II, section 15 of the Colorado Constitution (the "Taking Clause"). I write separately, however, to address the question of *when* property is unconstitutionally "taken" or "damaged" in an inverse condemnation proceeding, an issue that the majority only summarily discusses.

### I

In 1977, the City of Northglenn began a search for potential sites for a wastewater reservoir which would become part of a comprehensive wastewater treatment project.[1] One of the ten potential sites selected was the West half of Section 36, Township 1 North, Range 68 West of the 6th P.M. in Weld County, Colorado (the site). The mineral estate of the site had been severed from the surface estate and was owned by the State of Colorado, which issued a coal lease to Jack Grynberg.

By February 1978, Northglenn had selected the site as the best location for the reservoir. Northglenn began negotiations with the surface owner to acquire the reservoir site and subsequently announced publicly that the site had been selected for the reservoir.

Northglenn obtained permission from the surface owner to drill test holes on the site to assess the suitability of the site for construction of the reservoir, but did not obtain the permission of either the State of Colorado or Grynberg. An engineering consultant prepared a geology and soils investigation report based on the information obtained from the drilling and filed the

---

if) the line is to be drawn, we note the reasoning of the court of appeals in *Jorgenson v. City of Aurora,* 767 P.2d 756, 758 (Colo.App.1988) ("Given the constitutional genesis of a claim for inverse condemnation, and considering the nature of the right upon which this action is founded, we hold that this claim is not subject to the limitations of the Governmental Immunity Act"). We leave for another day resolution of

any apparent conflict between the Governmental Immunity Act and Article II, Section 15 of the state constitution.

1. A bond issue to finance the reservoir passed in July 1977, and bonds were issued and sold at various times throughout the project to finance the construction.

report with the state engineer's office on April 25, 1978.

On June 1, 1978, Northglenn purchased the surface estate for $609,000. Grynberg assigned his coal lease to his wife on March 3, 1980. In November 1980, Grynberg brought suit against Northglenn asserting numerous claims for relief, including an inverse condemnation claim. Not until March 1981, did Northglenn begin actual construction of the reservoir on the site.

## II

The question in this case is whether property was unconstitutionally taken or damaged prior to the assignment of the coal lease by Grynberg to his wife. The two procedural devices for guaranteeing that private property will not be unconstitutionally taken or damaged for public use without just compensation are eminent domain and inverse condemnation.

While a public entity seeks to condemn property and pay just compensation in an eminent domain action, a property owner must commence an inverse condemnation action. *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) (stating that inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted"); *State Dept. of Health v. The Mill*, 809 P.2d 434, 437 (Colo.1991) (same). An inverse condemnation action often arises because the public entity has refused to exercise its eminent domain power. *Morrison v. City of Aurora*, 745 P.2d 1042, 1045 (Colo.App.1987) (noting that an inverse condemnation action is the taking of private property by a public entity which has refused to exercise its eminent domain power). In an inverse condemnation action, the property owner must establish that a taking or damage occurred, whereas in an eminent domain action, the

condemning authority sets forth with specificity the property that is to be taken.

The difficult question in an inverse condemnation action is when the property is taken or damaged. In a physical taking case, the taking or damage "occurs" at a certain point and the unconstitutional taking or damage continues until the taking or damage ceases, or just compensation is paid. *State Dept. of Health*, 809 P.2d at 438. Under eminent domain, the taking or damage occurs contemporaneously with the institution of the condemnation proceedings. Because there is no "condemnation proceeding" in an inverse condemnation action, however, there is no one single uniform date at which the taking or damage "occurs." Instead, in an inverse condemnation action, courts examine the question of whether the Taking Clause has been violated and then determine the date when the property was taken or damaged.[2]

## III

### A

In *William E. Russell Coal Co. v. Board of County Comm'rs*, 129 Colo. 330, 270 P.2d 772 (1954), we addressed a similar claim in an action brought by the holder of a mineral estate for a violation of the Taking Clause. The public entity acquired the surface estate by condemnation in order to construct a road but did not condemn the mineral estate. The public entity essentially argued that it was not required to compensate the holder of the mineral estate because the road was not yet constructed and because it had acquired only the surface estate.

We disagreed and held that "when land is acquired by condemnation for a highway, the condemnor acquires not only what is understandably known as just the surface [but] whatever is necessary for the support of the surface." *Russell Coal*, 129 Colo. at

---

**2.** In many cases, however, courts have also recognized that the date of the taking may occur sometime before the *de jure* taking. Under a "*de facto* taking" analysis, the date of the taking is moved forward to reflect the actual taking (or substantial interference with the use and enjoy-ment of the property) which preceded the formal or legal taking. *See generally* Julius L. Sackman & Patrick J. Rohan, 4 *Nichols' the Law of Eminent Domain* § 12B.17[6] (3d ed. 1978 & 1993 Supp.) [hereinafter *Nichols* ]. *See also infra* note 3 (discussing *de facto* taking analysis).

334–35, 270 P.2d at 774. We recognized that the duty of a mineral estate holder to support the proposed construction imposed an additional servitude on the mineral estate and unconstitutionally damaged his property rights. *Id.*

We stated that "if a duty rests upon the owner of the mineral rights to preserve and support the highway *by not having the benefit of his mineral property right,* it then follows that he suffers a damage for which compensation should flow." *Id.* at 334, 270 P.2d at 774 (emphasis added). The critical question in this case therefore is whether Grynberg lost the benefit of his property right prior to his assignment of the mineral estate to his wife.[3]

## B

Two separate estates are created when the mineral rights are severed from the surface estate. *See Simson v. Langholf,* 133 Colo. 208, 215–17, 293 P.2d 302, 307 (1956). The majority recognizes that the owner of the severed mineral estate owes a duty of subjacent support to the surface estate in its natural state. Maj. op. at 180–181.[4]

However, the majority ignores the corresponding property rights that comprise a

---

**3.** I am troubled by the majority's citation to and continued reliance upon *Lipson v. Colorado State Dep't of Highways,* 41 Colo.App. 568, 569, 588 P.2d 390, 391 (1978). *See* maj. op. at 178 (stating that for a *de facto* taking, there must be "a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property") (quoting *City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971)); *see also* maj. op. at 181–182 (citing *Lipson*); maj. op. at 184 (quoting language from *City of Buffalo* in *Lipson*). Moreover, the majority erroneously bases its analysis of the questions of whether the unauthorized drilling or the filing of the Chen report constituted a taking upon *Lipson. See* maj. op. at 181–182, 184.

In fact, the language cited by the majority does not provide a standard for a taking, but instead states one test that courts use to determine whether a *"de facto* taking" has occurred. Both *Lipson* and *City of Buffalo* specifically addressed *de facto* taking arguments. However, Grynberg has not asserted that Northglenn's actions, culminating with the acquisition of the surface estate, constituted a *de facto* taking, nor does the majority address Grynberg's claims as a *de facto* taking.

The *de facto* taking issue poses difficult legal questions and courts have not uniformly addressed the requirements for a *de facto* taking. *See, e.g., Foster v. City of Detroit,* 254 F.Supp. 655 (E.D.Mich.1966) (finding that *de facto* taking did not require a physical invasion of property), *aff'd on other grounds,* 405 F.2d 138 (8th Cir.1968); *In re Elmwood Park Project Section 1, Group B,* 376 Mich. 311, 136 N.W.2d 896 (1965) (same); *Conroy–Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (Pa.1974) (*de facto* taking occurs when an entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of the property, but does not necessarily require a physical invasion). A *de facto* taking has also been described as follows:

If the prospective actual execution of a proposed municipal project will deprive the property owner of a beneficial use of his property by substantial impairment of some significant appurtenant right, and, as [a] result of advanced municipal publicity about the project plan and its consequences, the property loses its existent utility and financial viability to the point of subjecting the owner to losing the property, then a *de facto* taking must be deemed to have occurred.

4. *Nichols* § 12B.17[6], at 12B–229.

I would not reach the question of the scope or requirements of a *de facto* taking because this question has not been briefed or argued before this court. However, I note my disagreement with the majority's decision to equate the *Lipson* standard for a *de facto* taking to all taking analysis and the application of the standard to the facts of this case. In my view, the majority's reliance on the *Lipson* standard as the basis for its taking analysis, in a case where the *de facto* taking question has not been raised, is improper and inaccurate.

**4.** *Noonan v. Pardee,* 200 Pa. 474, 50 A. 255 (1901), explained the duty of subjacent support as follows:

Where there has been a horizontal division of the land, the owner of the subjacent estate, coal or other mineral, owes to the superincumbent owner a right of support. This is an absolute right arising out of the ownership of the surface. Good or bad mining in no way affects the responsibility. What the surface owner has a right to demand is sufficient support, even, if to that end, it be necessary to leave every pound of coal untouched under his land.

*Noonan,* 50 A. at 256. The duty of subjacent support is owed only to the land in its natural condition. 6 *American Law of Mining* § 203.-02[1], at 203–23 (2d ed. 1992); Roger A. Cunningham, et al., *The Law of Property,* § 7.4, at 420 (1984).

severed mineral estate. The owner of a mineral estate also possesses rights of ingress, egress, exploration, and surface usage as are reasonably necessary to the successful exploitation of his mineral interest. *Rocky Mountain Fuel Co. v. Heflin*, 148 Colo. 415, 422, 366 P.2d 577, 580 (1962); *Chambers–Liberty Counties Navigation Dist. v. Banta*, 453 S.W.2d 134, 136 (Tex. 1970).[5] Grynberg also claims that in *Grynberg v. City of Northglenn*, 739 P.2d 230 (Colo.1987) [hereinafter *Grynberg I*], we recognized an additional and exclusive property right of the owner of the mineral estate to consent to geophysical exploration that is constitutionally actionable. In my view, Grynberg mischaracterizes our holding in *Grynberg I*.[6]

Actionable constitutional damage occurs if a public entity deprives the owner of the mineral estate the benefit of his mineral property right. *Russell Coal*, 129 Colo. at

334, 270 P.2d at 774.[7] In many cases, the date of construction on the surface estate will serve as the date of the taking or damage to the severed mineral estate. In my view, however, the holder of a mineral estate need not wait for construction to actually begin on the surface estate to bring an inverse condemnation action if he can establish that the public entity has deprived him of the benefit of his mineral property right.[8]

In this case, however, Grynberg was not prevented from asserting his rights in the mineral estate prior to the conveyance to his wife. *See Chambers–Liberty*, 453 S.W.2d at 137 (holding that until an interference with a property right occurs, the public entity is not required to pay compensation). Accordingly, I concur with the majority's conclusion that property was not unconstitutionally taken or damaged.[9]

5. Without the right to develop the minerals, there is no purpose to severing the estates. Moreover, if the surface estate cannot be used, in most instances, the minerals cannot be extracted and the mineral estate is worthless.

6. In *Grynberg I*, we merely held that a geophysical trespass was actionable. *Grynberg I*, 739 P.2d at 239. The proper claim for the invasion of the property interest and the publication of the information does not lie in inverse condemnation, but rather should be brought in trespass or another action in tort.

In this case, the trial court dismissed Grynberg's other claims for relief. Because Grynberg did not appeal the dismissal, I would not reach the issue of whether these actions were properly dismissed or are barred by the Governmental Immunity Act, section 24–10–101 to – 120, 10A C.R.S. (1989 & 1992 Supp.).

7. I disagree with the majority that the questions of whether the construction of the reservoir either affected the access of the mineral estate owner or made the owner unable to mine the coal are not before us. Maj. op. at 181.

In fact, these questions are central to the determination of whether Northglenn deprived Grynberg of the benefit of his mineral property right and whether Grynberg can assert a constitutional claim for compensation. These questions necessarily must be answered to arrive at a conclusion that "Grynberg was not prevented from exploring or mining coal lying under the proposed site of the reservoir." *Id.*

8. Moreover, I disagree with the majority's conclusion that a diminution in value can never support a constitutional claim. In my view, this

conclusion cannot be reconciled with the majority's statement that a "taking occurs when a public entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property." Maj. op. at 178.

The holder of a mineral estate may have an actionable constitutional damage claim based on a depreciation in market value if the public entity has deprived him of the benefit of his mineral property right. The claim would arise as of the time of the deprivation. For example, a property owner would be entitled to compensation for a diminution in the value of the property based on a material and substantial impairment of the right to access. In my view, an assertion by the holder of a mineral estate that he was unable to mine his estate in the most reasonable, lowest-risk, and most cost effective method because of the actions of the public entity would constitute an actionable constitutional claim, because it would substantially deprive him of the use and enjoyment of that property.

9. However, I note my concern with the majority's analysis of the question of whether there was an unconstitutional "damage." Specifically, I disagree with any implication that some physical improvement or change of character of abutting or neighboring property is a prerequisite to recovery for an unconstitutional "damage." Maj. op. at 185 (citing *Denver Circle R.R. Co. v. Nestor*, 10 Colo. 403, 15 P. 714 (1887)).

I agree that the owner must show a unique or special injury that is different in kind from or not common to the general public to recover in a "damage" case. *Radinsky v. City & County of*

I am authorized to say that Justice KIRSHBAUM joins in this special concurrence.

*Denver,* 159 Colo. 134, 138, 410 P.2d 644, 646 (1966). However, there is no absolute prerequisite of "some physical improvement or change of character" to establish an unconstitutional "damage."

In my view, if Northglenn had deprived Grynberg of his right of access to the surface estate, Grynberg would have been able to establish a claim for an unconstitutional "damage." In such a case, Grynberg would clearly suffer a unique or special injury (the deprivation of his right of access), despite the lack of physical improvement or change of character in the surface estate.